Filed 11/18/21  Tze v. City of Palo Alto CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JOHN TZE et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>CITY OF PALO ALTO et al.,<br><br>    Defendants and Appellants. | G060401<br><br>(Super. Ct. No. 17CV309030)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed October 20, 2021, be modified as follows:

1.      On page 6, add the following sentence to the last full paragraph before the last sentence that begins with "Edgewood paid…":

Likewise, section 1.12.060(a) of the PAMC provided that "[a]ny recipient of an administrative citation may contest that there was a violation of the code . . . by completing a request for hearing form and returning it . . . within thirty calendar days from the date of service of the administrative citation."

2. On page 16, add and modify the first full paragraph after the sentence, "We agree.," as following:

> The record shows Edgewood did not timely challenge citations nos. 1 through 56, and it did not complete the administrative review process for citation nos. 71 and 72 prior to filing suit. These failures are not excused by any exception to the exhaustion doctrine.

3. On page on page 16, add the following footnote at the end of the second full paragraph:

> [FN]  Recent opinions have clarified the exhaustion doctrine does not implicate *subject matter* jurisdiction. But the requirement is still jurisdictional because, absent certain exceptions, a party must pursue its administrative remedies before resorting to the courts. (*Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1347; *Tesoro Refining & Marketing Co. LLC v. Los Angeles Regional Water Quality Control Bd.* (2019) 42 Cal.App.5th 453, 469.)

4. On page on page 16, add a new sentence at the end of the second full paragraph as follows:

> On appeal, Edgewood has the burden of showing the trial court erred in denying its writ petition under the exhaustion doctrine. (*Starcevic v. Pentech Financial Services, Inc.* (2021) 66 Cal.App.5th 365, 374.)

5. On page 17, add a new paragraph after the first full paragraph as follows:

In its petition for rehearing, Edgewood also appears to suggest that only a court can provide a legal interpretation of an ordinance. Not so. An administrative hearing officer can provide such an interpretation. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 6-7; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219.) Edgewood could have obtained a legal interpretation of the relevant ordinances through the administrative process. Consequently, the process provided Edgewood with an adequate remedy.

6. On page 22, delete the last paragraph (starting with, "Edgewood heavily relies …") and replace it with the following:

Edgewood heavily relies on the trial court's issuance of the preliminary injunction, which was based on due process grounds. But this ruling does not support Edgewood's contention. Among other things, the trial court's ruling was not as broad as Edgewood suggests. The court enjoined the City from enforcing any recently issued citations, assessing any further fines, and requiring Edgewood to prepay penalties prior to administrative review. This ruling was prospective. It was based on the court's determination that continuing to engage in these activities *at that point in the parties' dispute* would interfere with Edgewood's due process rights. But it did not address whether the prepayment scheme violated

3

Edgewood's due process rights as to the citations at issue in this appeal (citation nos. 1 through 56, 71, and 72). This is evident from the fact that the trial court rejected Edgewood's due process argument when ruling it had failed to exhaust its administrative remedies as to these citations. Moreover, the trial court found the prepayment requirement violated due process as applied. As discussed above, however, Edgewood did not make an as applied challenge. And even if it intended to do so, it did not support its argument with any relevant citations to the record or authority.

This modification does not effect a change in the judgment. The petition for rehearing is DENIED.

MOORE, ACTING P. J.

WE CONCUR:

FYBEL, J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN TZE et al., | |
| Plaintiffs and Appellants, | G060401 |
| v. | (Super. Ct. No. 17CV309030) |
| CITY OF PALO ALTO et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Peter H. Kirwan, Judge.  Affirmed.

Jarvis, Fay & Gibson, Rick W. Jarvis and Christina A. Lawrence; City of Palo Alto, Molly Stump, City Attorney, and Terence Howzell for Defendants and Appellants.

Rutan & Tucker and David P. Lanferman for Plaintiffs and Appellants.

\*          \*          \*

Plaintiff Edgewood SC LLC sought approval from defendants City of Palo Alto et al. (the City) to redevelop a shopping plaza.[1] The City approved the plan and passed a zoning ordinance creating guidelines for the redevelopment project. Among other things, the ordinance required Edgewood to "ensure the continued use" of a certain building on the plaza as a grocery store. Edgewood entered into a 10-year lease for the building with a grocer. But, through no fault of Edgewood, the grocer ceased operating after two years. The City claimed Edgewood had a duty under the ordinance to ensure a grocery store was operating in the building. It alleged Edgewood was in violation of the ordinance and began assessing daily fines. In contrast, Edgewood believed the ordinance only restricted the building from being used for any purpose other than a grocery store. Because it intended to fill the vacancy with a grocery store, Edgewood maintained no violation had occurred. Still, Edgewood paid the City's fines for over a year before filing any administrative appeal. Since it had waited so long to appeal, however, Edgewood could only timely challenge 14 of the 70 citations that had been issued by that time. The assigned hearing officer ultimately found in favor of the City and upheld the 14 citations challenged.

Edgewood then filed a petition for writs of administrative and traditional mandamus. The former sought to reverse the hearing officer's decision on the 14 citations, while the latter requested invalidation of all the citations issued by the City against Edgewood. On the writ of administrative mandamus, the trial court agreed with Edgewood, finding the ordinance only prevented the building from being used for anything other than a grocery store. As to the writ of traditional mandamus, the court found in favor of the City. It ruled the remaining citations were valid because Edgewood

---

[1] The Palo Alto City Council is also a party to this appeal. But since there is little difference between the City of Palo Alto and the Palo Alto City Council for purposes of this appeal, we generally refer to both as the City. Also, John Tze was initially a plaintiff in this matter but was later dismissed as a party.

had not exhausted its administrative remedies. The City appeals the court's administrative mandamus ruling, while Edgewood cross-appeals the traditional mandamus ruling.

We find no error. For the administrative writ, both sides agree the correct interpretation of the ordinance turns on the meaning of "continued use." Under both its common definition and specialized meaning within land use and zoning, requiring the "continued use" of the building as a grocery store only prevented Edgewood from allowing the building to be used for a nongrocery store purpose. It did not require Edgewood to ensure a grocery store was continually operating in the building. As to the traditional writ, it is undisputed Edgewood failed to exhaust available administrative remedies for the remaining citations. Edgewood has not shown it should be excused for failing to pursue those remedies.

For these reasons, we affirm the judgment.

I

FACTS AND PROCEDURAL HISTORY

*A. The Redevelopment Project*

Edgewood Plaza (the plaza) is a shopping center in the City that was developed in the 1950s. It was initially zoned as a "Planned Community" (PC), to be used primarily for retail. The original construction consisted of a building for a market (the grocery building) and two smaller one-story retail buildings. Over time, the plaza became a commercial failure and an area of blight. Edgewood eventually purchased the plaza and submitted a redevelopment proposal and application to the City in 2010.[2] Its proposal retained all the buildings in the plaza. But it suggested moving one of the retail

_____

[2] The applicant for the project is identified as nonparty Sand Hill Property Company, which is a property developer. Edgewood appears to be a subsidiary of Sand Hill and is the entity that holds title to the plaza.

buildings, which were deemed historically significant, to clear space for construction of 10 single-family homes and a public park.

In the redevelopment planning phase, there was some discussion among City staff as to whether the plaza should be redeveloped as a PC zone or a Commercial Neighborhood (CN) zone. Edgewood supported PC zoning for the plaza. Among other things, Edgewood believed it was desirable for the plaza "to have a grocery store use so that [the plaza] is a successful grocery anchored neighborhood center and not just another retail district." Edgewood also asserted that "[u]nder a CN zone a grocery user cannot be compelled whether for initial occupancy or long term occupancy. Only a PC zone can compel a grocery store." In April 2012, the City approved Edgewood's proposal for developing the plaza as a PC zone, which they memorialized in a zoning ordinance labeled Ordinance No. 5150 (PC 5150).

Like Edgewood, the City wanted a grocery store in the plaza. This is clear from various sections of PC 5150. For example, PC 5150 identifies one of the components of the project as "renovation of the [grocery] building in place for use as a grocery store." It also contains another section entitled "Special limitations on land uses," which provides "[t]he [grocery] building shall be primarily used for grocery uses only." Likewise, PC 5150 contains a list of public benefits arising from the redevelopment project, which includes the "[p]rovision of a grocery store in the [grocery] building." It further specified that no building permits would be approved for construction of the homes "prior to submittal to the Director [of Planning and Community Environment] of a lease agreement or other legally binding commitment from a grocery operator to occupy . . . the Grocery Building."

Edgewood began redevelopment of the plaza after PC 5150 was passed. Unfortunately, in September 2012, one of Edgewood's contractors mistakenly demolished the historic retail building that was meant to be relocated. The City issued a stop work order for the entire project but eventually allowed Edgewood to proceed with

4

just the renovation of the grocery building. Edgewood secured The Fresh Market as a tenant for the grocery building on a 10-year lease with multiple five-year extension options. The City approved the lease in February 2013, and The Fresh Market began operating in June of that year.

The City eventually authorized Edgewood to resume work on the remainder of the plaza. But to address the destruction of the retail building, the City passed Ordinance No. 5224 (PC 5224) in November 2013, which amended PC 5150. PC 5224 required Edgewood to pay the City $94,200 for the error and called for reconstruction of the demolished building. PC 5224 also modified the list of public benefits expected from the redevelopment project, including the benefit from the grocery building renovation. Like PC 5150, the public benefit was described as "[p]rovision of a grocery store in the [grocery] building." But in PC 5224, this was followed by a new sentence stating "[t]he commercial property owner shall ensure the *continued use* of the [grocery] building as a grocery store for the life of the Project." (Italics added.) It does not appear that anyone from the City discussed this revision with Edgewood. Nor was there any advance public notice indicating PC 5224 was making any material modifications to the requirements for the grocery building.

After PC 5224 was passed, Edgewood finished construction on the project and sold the homes.

## B. *The Fresh Market Closes*

The Fresh Market operated a grocery store in the plaza until March 2015, when its corporate headquarters decided to cease operations in California. In spite of this decision, The Fresh Market did not abandon or terminate its lease for the grocery building. It continued paying Edgewood rent and maintained its rights as a tenant. Immediately after learning of the impending closure, one of Edgewood's representatives reached out to the planning director for the City and informed her of the news.

Edgewood then began searching for a replacement tenant. In all, Edgewood's representatives contacted over 70 grocers. In August 2016, it initiated contact with a prospective tenant, Crystal Springs Produce. After negotiations and securing necessary approvals, The Fresh Market assigned its lease to Crystal Springs in August 2017. Crystal Springs is currently operating a grocery store in the plaza.

However, during the two-and-a-half-year period in which the grocery building was effectively vacant, the City used PC 5224 to compel Edgewood to locate a new grocer. In April 2015, the City sent a letter to Edgewood, alleging it was in violation of PC 5224: "[w]ith the closure of the grocery store in March 2015, the development is now in violation of Section 3(3) of PC-5224 that states: 'Provision of a grocery store in the [grocery] building. The commercial property owner shall ensure the continued use of the [grocery] building as a grocery store for the life of the project.'" The letter cautioned that "continued code violations may be subject to daily monetary fines." The City sent another letter in September 2015, warning that "[i]f [the] violation persist[ed], daily citations [would] be issued starting September 30, 2015. The[] citations [would] carry monetary penalties starting at $500 per day, increasing to $1000 per day until the violation [was] abated."

True to its letter, the City issued its first citation against Edgewood on September 30, and it continued to assess daily fines that eventually reached $1,000 per day. The citations asserted Edgewood was responsible for a "Violation of Zoning Laws" and referenced Palo Alto Municipal Code (PAMC) section 18.01.080 (and later section 18.38.020), PC 5224, and PC 5150. The listed violation was "[n]oncompliance with site's Planned Community Zoning which requires continued use of the [grocery] building as a grocery store for the life on [*sic*] the project." Each citation explained that "[a]ppeal of th[e] citation [could] be made by filling out a Request for Hearing Application and submitting a deposit within 30 days from the date of [the] citation." Edgewood paid the fines for over a year without making any appeals.

6

*C. Edgewood Files an Administrative Appeal*

In November 2016, over a year after issuing the first citation against Edgewood, the City Council adopted Resolution No. 9639, which increased the maximum penalties for PC zoning violations. Under this new resolution, the City began issuing citations to Edgewood with fines of $5,000 per day. Edgewood subsequently submitted its first administrative appeal of the citations under Chapter 1.12 of the PAMC. The appeal was timely for all citations from October 24, 2016 forward, i.e., citation nos. 57 through 70,[3] which totaled $248,250 in fines. It was unable to appeal citation nos. 1 through 56, representing $382,250 in paid fines, because the 30-day window to appeal those citations had expired.

The hearing on Edgewood's administrative appeal of the 14 citations occurred in early 2017 before a hearing officer hired by the City. The hearing officer upheld the entire sum of penalties issued by the City, finding PC 5150 and PC 5224 "unambiguously require[d] [Edgewood] to provide and use the [grocery] building . . . as a grocery store. [Edgewood's] assertion that the ordinances only impose a use requirement for the [grocery building] is without merit."

*D. This Action*

Edgewood then filed this lawsuit, seeking a petition for a writ of traditional mandamus challenging all of the citations and a petition for a writ of administrative mandamus contesting the hearing officer's decision on citation nos. 57 through 70. It also brought claims for declaratory and injunctive relief and for the denial of constitutional rights.

---

[3] Each of the citations are assigned a lengthy prefix number, e.g., citation no. J09302015-1. But each citation ends with a number showing its sequential order. Thus, the first citation ends with "-1," the second citation ends with "-2," etc. Both sides refer to the citations by their sequential order, as do we.

Meanwhile, the City had continued to issue citations during and after the administrative hearing. In total, it issued 78 citations amounting to $1,435,500 in fines. The City only stopped issuing citations after the court granted Edgewood's request for a preliminary injunction in June 2017. The court reasoned "the application of [PAMC] section 1.12.060 to require that [Edgewood] first pay all of the accrued and growing penalty amounts assessed by the City as a precondition to pursuing administrative and court remedies from administrative citations would impose an unreasonable and extreme financial hardship and prevent [Edgewood] from effectively exercising its due process rights."

The court divided trial into two phases. The first occurred in December 2017, and covered Edgewood's writ of administrative mandamus. The court found PC 5224 "formed the primary substantive basis for the penalties imposed." It concluded Edgewood had not violated PC 5224 and ordered the City to set aside citation nos. 57 through 70 and refund the penalties with interest. The court explained "[t]he heart of the dispute is whether the requirement of 'continued use' of the property as a grocery store [under PC 5224] is tantamount to 'continued operation.' [The City] essentially construe[s] the term 'use' as interchangeable with 'operate' or 'operation' in view of the descriptor 'continued,' and it is undisputed that a grocery store was not operating at the subject property during the relevant time. [Edgewood], on the other hand, argues the terms have different meanings and it did not violate the use requirement as a result of operations being interrupted by the departure of a tenant."

In determining the meaning of "use" within PC 5224, the court's analysis focused on both its dictionary definition and its meaning within the context of zoning and land use. Based on these sources, the court found "the requirement that [Edgewood] continuously use the subject building as a grocery store means the purpose for which the property could be used is restricted to a grocery store; it cannot be utilized for some other, non-grocery store purpose (e.g., a retail clothing store or office space). While a

8

grocery store was not functioning or operational during the relevant time due to the cessation of a tenant's business, [Edgewood] was not required under the terms of the ordinance to ensure the actual operation of a grocery store on an uninterrupted basis."

The second phase of trial focused on Edgewood's petition for a writ of traditional mandamus, which challenged the remaining citations (i.e., citation nos. 1 through 56, 71 & 72). The court denied the petition because it was "undisputed that [Edgewood] did not exhaust administrative remedies as provided by [PAMC] section 1.12.060. With respect to Citation Nos. 1-56, [Edgewood] simply did not pursue administrative review. As for Citation Nos. 71-72, [Edgewood] did seek administrative review but that process ha[d] not yet concluded."

Following the second phase of trial, Edgewood and the City agreed the court's rulings made it unnecessary for the court to resolve the remaining claims. They entered into a stipulation for judgment to be entered based on the court's rulings in the first and second phases, dismissing the remaining claims without prejudice, and making the preliminary injunction permanent. Judgment was entered in December 2018.

Both parties appeal the judgment. The City appeals the administrative mandamus ruling, arguing the court misconstrued PC 5224. Edgewood cross-appeals, asserting the court incorrectly applied the exhaustion of administrative remedies doctrine. We address both appeals below.

II

DISCUSSION

A. *The City's Appeal*

1. *Legal Standard*

"Interpretation of an ordinance presents a question of law that we review de novo." (*Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 919-920.) "'Courts interpret municipal ordinances in

9

the same manner and pursuant to the same rules applicable to the interpretation of statutes.'" (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.) "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them 'their usual and ordinary meaning.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387-388.)

### 2. Plain Meaning

The City's appeal centers on the correct interpretation of PC 5224, which both sides agree turns on the meaning of "continued use" within the ordinance. The City insists "continued use" within the ordinance is tantamount to "continued operation." Edgewood maintains the trial court correctly ruled "continued use" only meant the grocery building could not be used for any purpose other than a grocery store. We agree with Edgewood's interpretation based on the plain meaning of the ordinance.

The section of PC 5224 at issue declares that "[Edgewood] shall ensure the continued use of the [grocery] building as a grocery store for the life of the Project." Given that PC 5224 is a zoning ordinance governing land use for the plaza, we first examine the technical definition of "use" within this context as directed by the PAMC. Specifically, PAMC section 1.04.070 incorporates Civil Code section 13,[4] which provides that "technical words and phrases, and such others as may have acquired a

---

[4]  PAMC section 1.04.070 states that "[t]he provisions of Sections 13 and 1645 of the Civil Code of the State of California are hereby adopted in the interpretation of words and phrases, unless otherwise provided herein."

10

peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning or definition."

Within the context of land use and zoning, the term "use" describes a designated purpose assigned to a plot of land. (See *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 923-924; *Sabek, Inc. v. County of Sonoma* (1987) 190 Cal.App.3d 163, 167-168; *Orange County v. Goldring* (1953) 121 Cal.App.2d 442, 446-447.) When land is assigned a particular use (e.g., residential or commercial use), it simply restricts what a landowner may do with the property. (*Building Industry Legal Defense Foundation v. Superior Court* (1999) 72 Cal.App.4th 1410, 1416.) For example, land zoned for residential use is generally restricted from being used for nonresidential purposes. (See *Teachers Ins. & Annuity Assn. v. Furlotti* (1999) 70 Cal.App.4th 1487, 1496.) Thus, under this technical definition of "use," PC 5224 only restricted Edgewood from using the grocery building for any purpose other than a grocery store. It placed no affirmative requirement on Edgewood to ensure a grocery store was continually operating in the building, especially where Edgewood was blameless for the vacancy.

We reach the same conclusion under the common understanding of the word "use." Both parties agree with the trial court's definition of "use," which was derived from the American Heritage Dictionary: "[t]he word 'use,' when employed as a noun, refers to the manner or purpose for which something is used."[5] Under this definition, PC 5224 required Edgewood to ensure the grocery building was used as a grocery store and reserved for that purpose. But nothing in this definition suggests "use"

---

[5] Similarly, the Merriam-Webster's Dictionary defines "use" as "a method or manner of employing or applying something." (Merriam-Webster's Dict. Online (2021) <https://perma.cc/GL2Q-MDY4> [as of Oct. 20, 2021]; see *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].)

within PC 5224 required Edgewood to ensure a grocery store was operating in the grocery building.

The City appears to argue the adjective "continued" is what transforms "continued use" into the equivalent of "continued operation." "Continued" is defined as "lasting or extending without interruption." (Merriam-Webster's Dict. Online (2021) <https://perma.cc/AFJ4-4XKU> [as of Oct. 20, 2021].) The flaw in the City's argument is that "continued" is still modifying the word "use." Adding "continued" does not automatically convert the meaning of "use" into "operation." As the trial court observed, "[t]he distinction between the terms 'use' and 'operation' is essential here, and the adjective 'continued' does not create any ambiguity in meaning or justify construing the requirement of 'continued use' of the building as a grocery store as creating a condition for uninterrupted operation."

### 3. Extrinsic Factors

Since we believe the plain meaning of PC 5224 is clear, we need not delve into extrinsic factors such as its legislative history or public policy. Regardless, none of these factors support the City's interpretation of the ordinance.

We begin with the legislative history of PC 5224. Primarily, the City relies on statements made prior to the enactment of PC 5150 and 5224 showing the City and Edgewood both specifically zoned the property to ensure the grocery building would be used as a grocery store. As set forth above, Edgewood's proposal for the project stated, "it is desirable to have a grocery store use so that this is a successful grocery anchored neighborhood center and not just another retail district. Under a CN Zone a grocery user cannot be compelled whether for initial occupancy or long term occupancy. Only a PC Zone can compel a grocery store." The City cites other similar examples showing it intended to use PC 5150 and 5224 to ensure there was a grocery store in the plaza.

12

This evidence does not materially support the City's interpretation. It is undisputed the City and Edgewood both wanted a grocery store in the plaza. But that does not necessarily mean the City intended PC 5224 to require Edgewood to a ensure a grocery store was continually operating in the grocery building. It is equally plausible the City believed its desire for a grocery store could be fulfilled through a restriction limiting use of the grocery building for such purposes.

There are strong financial incentives that compel a landowner to diligently find tenants to occupy its buildings and pay rent. This is especially true when an anchor tenant is involved, as was the case here. "The anchor tenant at a neighborhood shopping center is commonly regarded within the industry as an important if not crucial element in the center's success. It attracts shoppers who also can be expected to patronize the satellite stores which, if things go as planned, generate much of the owner's profit by filling the remaining space and paying rents based on the added business drawn by the anchor." (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 511.) Due to these economics, it was crucial for Edgewood to ensure an anchor tenant was in place at the grocery building. Nothing in the record suggests the City specifically contemplated that fining Edgewood would add any additional incentive for it to find a new tenant if the building became vacant. As such, there is no reason to presume the City believed a continual operation requirement would better ensure a grocery store remained in the plaza compared to a use restriction on the grocery building.

We recognize this case presents a unique scenario in which The Fresh Market ceased operation but continued to pay rent. Thus, arguably, Edgewood did not have as great a financial incentive to locate a new tenant when the grocery building became vacant. However, the City has not cited anything in the record showing it anticipated this when passing PC 5150 or 5224. In other words, there is no evidence showing either of these ordinances were drafted to avoid this situation. Accordingly, we cannot infer that when PC 5150 and 5224 were passed, the City believed a use restriction

13

was insufficient to ensure the plaza had a grocery store and that it sought to enact a continuing operation requirement instead.

Moreover, the City's enactment of a prior ordinance shows it understood the difference between "use" and "operation." A few years prior to passing PC 5224, the City enacted Ordinance No. 5069 (PC 5069) for another planned community. Significantly, in describing the "[s]pecial limitations on land uses" for the lot, PC 5069 required that "[t]he grocery store space shall remain in *continuous operation* as a grocery store. 'Continuous shall be defined to include brief closure for ordinary business purposes.'" (Italics added.) The contrast between PC 5069 and 5224, which both concerned PC zoning, signifies that selecting the phrase "continued use" in PC 5224 rather than "continuous operation" was intentional. It also strongly suggests the two terms have different meanings. (See *Wasatch Property Management v. Degrate*, *supra*, 35 Cal.4th at p. 1118 ["'"[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded"'"].)

Finally, the trial court's interpretation of PC 5224 is reinforced by public policy. Ensuring the continued operation of any business on a property is an onerous burden for a landowner. Generally, the landowner does not manage its tenants' businesses and, consequently, has little control over whether a tenant can remain in operation. When a tenant ceases to operate, even diligent attempts to secure a new tenant can take several months or years, as happened here. Due to the heavy burden placed on developers by a continuous operation requirement, a city seeking to enact such an obligation must do so in explicit terms. As explained above, the term "use" has a specialized meaning within the context of land use and zoning. If the City wanted "use" to have a different meaning when it passed PC 5224, it should have defined the term. Or, as it did in PC 5069, it should have used another word.

14

### *4. Deference to the City's Interpretation*

Though the City argues we should give deference to its interpretation of its own ordinance, "[w]e are not bound by an administrative agency's position where, as here, it contradicts the language of the statute. . . . [Citation.] While agency interpretation of the meaning and legal effect of a statute . . . is entitled to consideration and respect by the courts, courts must independently judge the text of a statute. Further, the weight accorded to an agency's interpretation is 'fundamentally situational' . . . and 'turns on a legally informed, commonsense assessment of [its] contextual merit.' [Citation.] 'Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning . . . . Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth.' [Citation.] The degree of deference accorded is dependent in large part upon whether the agency has a '"comparative interpretative advantage over the courts"' and on whether it has arrived at the correct interpretation." (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1237-1238.)

The City's interpretation of PC 5224 is not entitled to any deference. As discussed above, under either the common understanding or its specialized meaning, "continued use" is not synonymous with "continued operation." PC 5224 only restricted Edgewood from using the grocery building for any purpose other than a grocery store. It did not require Edgewood to ensure a grocery store was continually operating there. Likewise, nothing in the history of the ordinance convinces us the City has comparative advantage in interpreting the ordinance or that its interpretation is correct.

15

*B.  Edgewood's Cross-Appeal*

Edgewood's cross-appeal pertains to the second phase of trial, in which Edgewood sought a writ of mandate directing the City to set aside the remaining citations (citation nos. 1 through 56, 71, 72).  The court denied this request, finding Edgewood had failed to exhaust its administrative remedies.  We agree.  Edgewood admits it did not do so.  And, contrary to Edgewood's assertions, that failure is not excused by any exception to the exhaustion doctrine.

"In general, a party must exhaust administrative remedies before resorting to the courts."  (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080.)  The exhaustion doctrine "'applies where a statute provides an administrative remedy, even though the *terms* of the statute do not make the exhaustion of the remedy a condition of the right to resort to the courts.'"  (*Flores v. Los Angeles Turf Club, Inc.* (1961) 55 Cal.2d 736, 747.)  The "requirement that administrative remedies be exhausted is jurisdictional.  [Citation.] Intervention by the court before the administrative agency that has resolved the claim would constitute an interference with the jurisdiction of another tribunal."  (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151.)

*1.  Inadequate Remedy*

Primarily, Edgewood contends it did not have to exhaust administrative remedies because the City's process did not provide an adequate remedy.  While this is a well-recognized exception to the exhaustion doctrine (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609), Edgewood has not shown it applies here.

First, Edgewood claims the administrative process was inadequate because the City's hearing officers lacked authority to provide a legal interpretation of PC 5224's meaning.  It maintains a hearing officer could only determine whether a violation of

16

PC 5224 occurred based on the City's interpretation of the ordinance. Not so. Nothing in the PAMC expressly limits a hearing officer's authority in this manner. Rather, the PAMC appears to confer hearing officers with broad powers, stating they "shall make findings and issue a decision regarding: [¶] . . . [t]he existence of the violation." (PAMC, § 1.12.100, subd. (c)(1).)

Indeed, Edgewood's position is undercut by the administrative hearing on citation nos. 57 through 70. There, the City argued the hearing officer had no authority to provide a legal interpretation of PC 5224. The hearing officer rejected this argument. He considered Edgewood's contention that PC 5224 only imposed a use restriction on the grocery building but was unpersuaded by it, finding "[PC 5224] unambiguously require[d] [Edgewood] to provide and use the [grocery] building . . . as a grocery store. [Edgewood's] assertion that the ordinance[] only impose[d] a use requirement for the structure itself is without merit." Rather, the hearing officer found PC 5224 required Edgewood "to provide a replacement grocery store" upon a vacancy of the grocery building.

Next, Edgewood contends "[a] policy that only provides for the submission of disputes to a decision maker without stating whether the aggrieved party is entitled to an evidentiary hearing or the standard for reviewing the prior decision is generally deemed inadequate." This assertion is belied by the PAMC. It provides for a hearing within 15 to 60 days from the date the request for a hearing is filed. (PAMC, § 1.12.090, subd. (b).) Further, "[a]t the hearing, the party contesting the administrative citation shall be given the opportunity to testify and to present evidence and cross-examine witnesses concerning the administrative citation. . . . Prehearing discovery is not authorized, but subpoena of witnesses and documents shall be permitted as authorized by law." (PAMC, § 1.12.090, subd. (c).) The PAMC also specifies the hearing officer shall make determination based on "a preponderance of the evidence." (PAMC, § 1.12.100, subd. (e).)

17

## 2. *The Nullity Exception*

Edgewood also insists the exhaustion doctrine does not apply under what it calls the "nullity exception." Under this theory, Edgewood claims that since the City lacked authority to issue any citations under PC 5224, all the resulting citations were rendered null as a matter of law, so it was not required to pursue administrative remedies.[6] We disagree.

Although Edgewood generally refers to its argument as falling under the nullity exception, this is a misnomer. As our Supreme Court has explained, "[t]he nullity exception is . . . *specific to tax disputes*. . . . 'Ordinarily a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts. [Citations.] An exception is made when the assessment is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which . . . might be resolved in the taxpayer's favor, thereby making further litigation unnecessary.'" (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1275, italics added.) Edgewood appears to suggest this tax-specific exception should be applied here. But it has not cited any authority showing it has been applied outside of tax cases. Nor has it provided any reasoned argument as to why we should do so. Therefore, we will not consider whether to extend the nullity exception outside of tax disputes. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 (*Hernandez*).)

Edgewood also cites two nontax cases in which the plaintiffs were not required to exhaust administrative remedies. But these cases did not invoke the nullity

---

[6] Edgewood also argues the citations were nullities because they were issued in part under PAMC section 18.01.080, which only authorizes punishment if the violator of a zoning regulation has been convicted of a misdemeanor. Since it was never convicted of a misdemeanor, Edgewood maintains it could not be punished under this ordinance. This argument is immaterial because Edgewood's citations were also based on PC 5224, which did not have a conviction requirement.

18

exception and involved unique circumstances inapplicable here. The first, *City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 344, 346-347 (*Randtron*), concerned an ordinance authorizing the City of Lodi to issue soil or groundwater abatement orders to landowners. The defendant did not contest an abatement order issued by the City of Lodi under the ordinance. The City of Lodi then filed a lawsuit seeking an injunction to compel the defendant to comply with the order. (*Id*. at pp. 347-348.)

When the defendant claimed the order was invalid, the City of Lodi asserted the order was unchallengeable because the defendant had not exhausted its administrative remedies. The court disagreed. It found the ordinance was preempted by state law. (*Randtron*, *supra*, 118 Cal.App.4th at pp. 348-350.) As such, the City of Lodi lacked subject matter jurisdiction to issue the challenged order. "A lack of subject matter jurisdiction is 'an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.'" (*Id*. at p. 360.) Given this lack of authority, the court concluded the exhaustion doctrine is inapplicable where an agency lacks subject matter jurisdiction to issue an order. (*Ibid*.)

Edgewood also relies on *Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911 (*Ramirez*). At issue in *Ramirez* was California's nonjudicial forfeiture procedure (Health & Saf. Code, § 11488 *et seq*.). Under this statutory scheme, only the Attorney General or a district attorney can initiate nonjudicial forfeiture proceedings. When doing so, the initiating party must give notice to the person whose property was seized, including instructions for filing a claim. (*Ramirez*, at pp. 930-931.) If a timely claim is filed, "'"[t]he nonjudicial forfeiture proceeding is terminated"'" and "'the [initiating party] cannot pursue nonjudicial forfeiture but must initiate a judicial forfeiture proceeding."'" (*Ibid*.)

The plaintiffs in *Ramirez* sought the return of their seized property on grounds the nonjudicial forfeiture proceedings were improperly initiated by police officers rather than prosecutors. (*Ramirez*, *supra*, 9 Cal.App.5th at p. 917.) In response,

19

the government-agency defendants argued the plaintiffs had not filed claims and, consequently, had not exhausted their administrative remedies. (*Id*. at p. 930.) The court rejected their argument. It explained that nonjudicial forfeiture proceedings can only be initiated by the Attorney General or a district attorney. Since the proceedings at issue were not, they were "'invalid in the first instance.'" (*Id*. at pp. 931-932.) "[T]he question of whether plaintiffs filed a claim '[was] not relevant to [the court's] determination . . . for there was no proper or valid forfeiture proceeding to which [the plaintiffs] could make a claim.'" (*Ibid*.)

Significantly, though, *Ramirez* clarified that where proceedings are initiated by the proper prosecuting agency, "a claim *must* be filed . . . as a prerequisite to seeking judicial relief through mandamus." (*Ramirez*, *supra*, 9 Cal.App.5th at p. 931, fn. 17, italics added.) A party must exhaust administrative remedies where "the government official or agency issuing the challenged . . . order . . . *had statutory authority* to issue such orders, and *the only question was whether the statutory requirements for the issuance thereof were fully met* in that particular instance." (*Id.* at p. 933, second italics added.) The exhaustion doctrine did not apply in *Ramirez* "because the supposed forfeiture proceedings [did] not carry any force of law since the persons initiating them were devoid of statutory authority to act." (*Ibid*.)

In *Randtron* and *Ramirez*, the party issuing the challenged order had no authority to act. In *Randtron*, the City of Lodi had no authority to issue the abatement orders because its ordinance was preempted by state law. (*Randtron*, *supra*, 118 Cal.App.4th at pp. 348-350.) In *Ramirez*, the police officers had no authority to initiate nonjudicial forfeiture proceedings since that power was solely vested in the Attorney General and district attorneys. (*Ramirez*, *supra*, 9 Cal.App.5th at pp. 930-931.) That is not the case here. Unlike *Randtron* and *Ramirez*, its uncontested the City had jurisdiction to pass and then enforce PC 5224 by issuing citations and had jurisdiction to hear disputes concerning citations issued under PC 5224. The present dispute focuses on

20

whether the City *met the requirements* for issuing the contested citations under PC 5224. As explained in *Ramirez*, the exhaustion doctrine applies in such cases. (*Ramirez*, *supra*, 9 Cal.App.5th at p. 933.)

### 3. Due Process

A petitioner need not exhaust administrative remedies if the "'remedy provided does not itself square with the requirements of due process.'" (*Bockover v. Perko* (1994) 28 Cal.App.4th 479, 486.) Here, the PAMC requires a party contesting *any* administrative penalty to either prepay the fine or file a hardship petition. (PAMC, §§ 1.12.010, 1.12.060 subd. (a) & 1.12.070.) Edgewood alleges this entire prepayment scheme is unconstitutional. In support, Edgewood only cites general authority stating "'the due process clause [requires] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" (*Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 549.) This argument is unconvincing.

"[D]ue process is the opportunity to be heard at a meaningful time and in a meaningful manner. [Citation.] It is a flexible concept requiring accommodation of the competing interests involved, and its procedural requisites necessarily vary depending on the importance of the interests involved and the nature of the controversy." (*Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568, 576, fns. omitted.) Requiring payment of a fine prior to an administrative hearing does not inherently violate due process. (See, e.g., *Love v. City of Monterey* (1995) 37 Cal.App.4th 562, 572-573 [prepayment of parking fine did not violate due process]; *Tyler v. County of Alameda* (1995) 34 Cal.App.4th 777, 786-787 [same].) Thus, the entire premise of Edgewood's argument – that prepayment requirements are facially unconstitutional as a matter of law – is flawed. Edgewood has not cited any cases finding a similar statutory scheme unconstitutional. Nor does it argue the prepayment requirement is unlawful as applied here.

21

Without more, Edgewood has not met its burden. In particular, it has failed to overcome two presumptions. First, ordinances are presumed to be constitutional. "A party challenging the constitutionality of such a measure has the burden of producing evidence to overcome that presumption." (*Powell v. County of Humboldt* (2014) 222 Cal.App.4th 1424, 1445–1446.) Second, "[t]he trial court's ruling is presumed to be correct on appeal, and the burden is on the appellant to affirmatively show error." (*Starcevic v. Pentech Financial Services, Inc.* (2021) 66 Cal.App.5th 365, 374.) "[T]he appellant must frame the issues for us, show us where the superior court erred, and provide us with the proper citations to the record and case law. ""[D]e novo review does not obligate us to cull the record for the benefit of the appellant. . . . As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error . . . by citation to the record and any supporting authority.""" (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913.)

Edgewood cannot proclaim the City's administrative hearing procedure violates due process, cite a general principle of law, and then expect us to piece together an argument on its behalf. "'We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise.' [Citations.] We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.'" (*Hernandez*, *supra*, 37 Cal.App.5th at p. 277.)

Edgewood heavily relies on the trial court's issuance of the preliminary injunction, which found the prepayment requirement interfered with Edgewood's due process rights. This ruling is unpersuasive by itself. "[T]he issuance of [a] preliminary injunction is not a decision on the merits of the complaints filed by the parties." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 74, fn. 7.) Further, Edgewood cites no case law supporting the court's decision. Nor does the court's order granting the preliminary injunction cite any relevant authority. Finally, the court appeared to find an

22

*as applied* violation. Its order states "the *application* of [PAMC] section 1.12.060 to require that Petitioner first pay all of the accrued and growing penalty amounts assessed by the City as a precondition to pursuing administrative . . . remedies . . . would impose an unreasonable and extreme financial hardship and prevent [Edgewood] from effectively exercising its due process rights." (Italics added.) As discussed above, however, Edgewood did not make an as applied challenge. And even if it intended to, it did not support its argument with any citations to the record or authority.

### 4. *Equity*

Edgewood also maintains that allowing the remaining citations to stand would be inequitable under the principles of estoppel or unjust enrichment. But it has not provided any authority showing these principles have any bearing here. The cases cited by Edgewood relate to tax assessments on properties that were later determined to be tax exempt. (See *J. H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 992-993; *Exchange Bank v. County of Sonoma* (1976) 59 Cal.App.3d 608, 610; *Brenner v. City of Los Angeles* (1911) 160 Cal. 72, 79-80.) Edgewood has not cited any authority applying these equitable principles to the exhaustion doctrine outside a tax dispute. Nor does it provide any reasoned argument for extending this exception, and we will not make the argument for Edgewood. (*Hernandez*, *supra*, 37 Cal.App.5th at p. 277.)

Besides, even if these principles were relevant here, Edgewood has not established any basis for applying them. It has not shown any unfair or unjust circumstances warranting the application of either estoppel or unjust enrichment. (See *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315; *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 389.) Edgewood could have challenged the fines when they were first assessed. It did not. It waited over a year to make its first challenge, and it has not provided any compelling reason for doing so. While Edgewood claims the City

23

suggested the fines might be refunded after a new grocer was found, nothing in the record shows the City made any definitive statement it would do so.

Edgewood also insists it paid the fines under duress because it was worried that (1) it would be assessed late penalties, and (2) failure to pay would damage its relationship with the City on future projects. As to the first issue, Edgewood's fear of late penalties could have been alleviated by filing an appeal. The citations state "[f]ailure to pay *or appeal* within 30 days may result in additional penalties." (Italics added.) The second contention is contradicted by the record. Edgewood cites testimony from John Tze, one of its principals, in support of this argument. But his cited testimony was, at best, ambiguous as to whether challenging the citations would have damaged Edgewood's relationship with the City:

"Q: Would it be fair to say you were concerned that had you submitted written protests initially it would have jeopardized your relationship with the City planning staff?

"A: You know, I don't think it would – I wouldn't say necessarily -- I can't speak to whether it would jeopardize our relationship."

In short, Edgewood has not shown any basis for applying equity here.

24

III

DISPOSITION

The judgment is affirmed.  Each party shall bear their own costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25