Filed 6/17/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>JESSE JOHNSON III,<br><br>    Defendant and Appellant. | A160025<br><br>(Contra Costa County Super. Ct. No. 51913912) |

A jury convicted defendant Jesse Johnson III of multiple offenses arising from a domestic violence incident against his wife in the presence of their daughters. Among other things, he was convicted of two separate counts (count 5 and count 2) of dissuading a witness by force or threat of force or violence under Penal Code section 136.1, subdivision (c)(1)[1] ("section 136.1(c)(1)"), which makes attempting to dissuade a witness from reporting a crime using force or the threat of force a felony. His count 5 conviction was based on a statement Johnson made to his family that if the police came, he would blow his brains out. His count 2 conviction was based on a separate statement Johnson made to his wife that if she called the police, they would both be dead before the police arrived.

As to his count 5 conviction (based on the statement to his family that he would blow his brains out), Johnson contends there was insufficient

---

[1] All statutory references are to the Penal Code unless otherwise stated.

evidence as his threat of self-harm did not constitute substantial evidence of harm to any "witness or victim or any third person," as required by section 136.1(c)(1). We agree and conclude that a defendant who threatens violence upon himself does not threaten a "third person" within the plain meaning of section 136.1(c)(1).

As to his count 2 conviction (based on the statement to his wife that they would both be dead if his wife called the police), Johnson contends the court committed instructional error by incorrectly stating the law under section 136.1(c)(1). We agree with the People's contention that Johnson forfeited this argument and that there is no need for us to reach the merits of his instructional error claim because his substantial rights were not affected.

In addition, we conclude that Johnson's count 2 conviction was improperly classified on his abstract of judgment as a violent felony. We also conclude that any unpaid balance of the booking fee imposed on Johnson must be vacated based on recent legislation.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of May 26, 2019, Johnson entered the two-story Antioch house where his wife, Jane Doe 1, lived with their four daughters: P., S.J., S., and Jane Doe 2, who ranged in age from 22 to 15 years old. At the time, Johnson and Doe 1 were married but separated. That morning, the couple got into an argument that became so heated it woke the house. Someone called the police, and Johnson was later arrested.

On July 31, 2019, an information was filed charging Johnson with one felony count of first-degree residential burglary (§ 459; count 1), two felony counts of dissuading a witness by force or threat (§ 136.1, subd. (c)(1); counts 2 and 5), one felony count of criminal threats (§ 422, subd. (a); count 3), one felony count of unlawful possession of a firearm following a felony conviction

2

(§ 29800, subd. (a)(1); count 7), one felony count of unlawful possession of ammunition (§ 30305, subd. (a)(1); count 8), one misdemeanor count of spousal battery (§ 243, subd. (e)(1); count 4), and one misdemeanor count of child endangerment (§ 273a, subd. (b); count 6). The information alleged on count 1 that Johnson was armed with a firearm during the burglary (§ 12022, subd. (a)(1)), and on count 5 that Johnson personally used a firearm while attempting to dissuade a witness (§ 12022.5, subd.(a)).

Johnson's jury trial disclosed the following evidence:

## A. Prosecution's Case

### 1. May 26, 2019

On May 26, 2019, Doe 2 called 911 from her bedroom closet on the second floor of the house. A recording of the call was played to the jury. On the call, Doe 2 explained that she woke up when she heard her mother screaming and said her father was hitting her mother. Johnson could be heard yelling expletives in the background. When asked if her father had been drinking or doing drugs, Doe 2 responded, "I'm not sure. He doesn't live here anymore." She twice repeated that her father no longer lived at the house and that she did not know where he was living. After the operator stated officers were on the way, Doe 2 stated she thought her father had a gun because "a second ago he just said that if the police come here he's gonna – he's gonna blow his brains out." The 911 operator ended the call when she heard officers talking to Johnson downstairs.

Officer Robert Ibanez, one of the multiple responding officers who testified at trial, had been dispatched to the Antioch house because the reporting party had called and said her father Johnson was out of control, he possibly had a gun, and if police came he would blow his brains out. When Doe 1 opened the door for the officers, she was crying and appeared to be in

3

fear.  Officer Ibanez entered the house and called out for Johnson, who emerged from the downstairs bedroom.  He asked Johnson to take a seat on a couch, which he did.  While Officer Ibanez stayed with Johnson, other responding officers made contact with Johnson's wife and daughters.

Officers Denny Barrera and Kevin Tjahjadi, both of whom testified at trial, located Doe 2 upstairs.  Officer Barrera thought she looked upset, scared, and timid.  She appeared hesitant to speak to the officers in the open hallway but agreed to speak in her bedroom and did so in a whisper.  Their recorded conversation was played to the jury.  Doe 2 explained that her father did not live at the house and was not there when she went to bed the night before.  She woke up around 5 a.m. when she heard her mother screaming.  She ran into the master bedroom and saw her father choking her mother.  Seconds later, her older sisters P. and S.J. came into the room and tried to get their father off their mother.  In the tussle, Johnson punched S.J. in the face.  He also hit Doe 2 with his palm and struck the right side of her chin.  Her mother ran out of the room with her father in pursuit.

Doe 2 returned to her room and called 911 from the closet.  From there, she heard more yelling.  She confirmed her father said that if the police came he would blow his head off.  When Officer Barrera followed up about her belief that her father had a gun, she responded, "I'm pretty sure he does. . . [¶] . . . I've seen it before."  She had last seen the gun a week or two earlier.  She thought the gun might be in her mother's room, and pleaded, "Y'all can get him outta here.  Right? . . . [¶] . . . I just had to be sure 'cause he's, like, really manipulative."  At the end of the exchange, Doe 2 repeated, "I really wish I weren't scared. . . [¶]  . . . I wish I weren't scared."

During Doe 2's interview, Officer Tjahjadi, who was standing near her bedroom door, saw S.J. pacing in the hallway and attempting to peek into

4

Doe 2's room. Officer Tjahjadi approached S.J. and quietly asked, "Where's the gun?" S.J. tilted her head left towards her shoulder. Officer Tjahjadi took this to mean the gun was downstairs or she was not ready to share any information because her father was there. When asked again about the gun, S.J. whispered, "When he leaves." She appeared too scared to tell the officer where the gun was as long as her father was downstairs.

After they finished speaking with Doe 2 and removed Johnson from the house, Officers Tjahjadi and Barrera made their way to the downstairs bedroom and found a loaded handgun atop a laundry bin filled with clothes.

Officer Barrera subsequently interviewed S.J. Their conversation was recorded and played to the jury. Asked about the firearm they found, S.J. said she saw it "[w]hen [her father] told [her] if [the police] came he was going to blow his brains out." Her father had come downstairs and pointed the gun at himself. S.J. and another sister ran downstairs and asked him to put the gun away because they did not want him to shoot himself or their mother. She saw him deposit the handgun on the clothes in the downstairs room.

Officer Daniel Fachner, another responding officer who testified at trial, spoke with Doe 1 that morning. Doe 1 was crying throughout the recorded interview, which was played to the jury. Doe 1 explained she and Johnson were married but in the process of separating. Johnson had not been to the house in over a month. The day before, he sent her threatening texts and she responded that if he came over, she would call the police. That morning, he showed up unexpectedly at 4 a.m. and walked into her bedroom drunk, argumentative, and threatening. He was angry because she had spoken to someone he considered his enemy. At some point, the argument got physical. Johnson grabbed her neck and tried to hit her as she tried to

5

leave the room.  He called her "maggot bitches."  Soon after, their children came running into the room.  At that point, he struck her with his fist.

This incident was not the first time they had a physical altercation. The police had been called before, but Johnson had never been arrested. Johnson regularly threatened that if he ever got arrested, he would return and kill her.  Doe 1 said she needed to relocate because a protective order would just make him angry and he would disregard it.  She did not know where Johnson was living at the time.  Asked whether she would cooperate with the District Attorney if Johnson were charged, she replied, "I'm afraid."

### 2.    Further Investigation

A couple of days after Johnson's arrest, Doe 1 spoke with an Antioch Police Department detective, who recorded the interview, which was played to the jury.  Doe 1 noted that she had actually called the police earlier because she wanted to confirm that Johnson was still being detained.  She needed to know his whereabouts because she was trying to relocate before his release since she knew "he's gonna come back."

Asked to explain what happened two days earlier, Doe 1 recounted that Johnson entered the house around 4 a.m.  She was lying in her bed when he came into her room, and he threatened that both of them would be dead if she contacted the police.  He accused her of betraying his trust by talking to his mistress's husband.  Since he had been drinking, Doe 1 did not understand much of what Johnson was saying.

While Doe 1 was still in bed, Johnson picked up her phone and shoved it in her face.  When she jumped out of bed and tried to run out of the room, he grabbed her by the neck.  She started screaming.  Johnson then pressed his forearm on her neck, strangling her.  She was in pain and could not breathe.  Hearing the commotion, their children rushed into the room.  When

6

they entered, Johnson still had his arm around Doe 1's neck. To get free, Doe 1 bit one of Johnson's fingers. The children begged him to leave. In the middle of this turmoil, they heard the police knock on the door. Johnson ran into the downstairs room, and Doe 1 let in the police. Asked whether she believed his threats to kill her were credible, "Yeah. I believed him. You know, I wasn't sure but I didn't wanna take any chances."

Days later, Doe 1 and the detective spoke again, and this interview was also recorded and played to the jury. Doe 1 confirmed that Johnson had come into the room and told her that if she called the police she would be dead before they got there. Asked why he would say this, she explained that he was angry because they had broken up and she refused to reconcile. A couple of days before he came to the house, they had spoken on the phone. Johnson told Doe 1 that he did not want to break up and was not going to let her go. Doe 1 told him if he came over to the house, she would call the police. When he came over without her permission, he continued to threaten her, repeating that if she called the police, she or they would both be dead before the police arrived.

### 3. Recorded Jailhouse Calls

Four recorded jailhouse calls involving Johnson were played to the jury.

In a May 30, 2019 call with Doe 1, Johnson asked who called the police on him. Doe 1 claimed the neighbors did, but Johnson did not believe her because someone told the police about the gun, about which the neighbors would not have known. Johnson believed Doe 2 made the call. He wished he could put whichever child had called "back in [his] nuts." When Doe 1 reminded Johnson that he had been yelling and screaming about how he was going to shoot her, Johnson responded, "I said myself. That's what I said."

In a July 25, 2019 call with a woman named L.J., with whom Johnson was in a relationship, Johnson explained that he had been suffering from depression for a long time. He said the "gun thing" was on him, and he was not going to "do anything to anybody." He had put the gun to his head, his hearing muffled, and he started to count intending to pull the trigger on three. But someone grabbed his arm and said to him, "I love you." At that point, he could hear again and put the gun down.

In a July 28, 2019 call with one of his daughters, Johnson complained that Doe 2 said he had hit her. He stated, "You know I ain't never hit y'all." The daughter responded, "You did dad." She also reminded Johnson that he hit both S.J. and Doe 2 that morning. He claimed that it was an accident, he did not try to hit anyone, and he was just talking with his hands.

In a September 20, 2019 call with L.J., Johnson revealed that he had "sent out instructions to everybody" to study so they could have "matchin' lines in [his] play." He explained that he "outlined every single detail" and the script disposed of "every single thing except for that one thing." He noted that "the play has to be well-orchestrated and read." Johnson said that if everyone "play[ed] ball" and rehearsed, then he felt great about it.

### 4. Family Members' Trial Testimony

At Johnson's trial, which took place mid-October 2019, Doe 1, Doe 2, and S.J. testified, often inconsistently with their prior statements to police.

Doe 2 testified that in May 2019, she was living in the family's Antioch house with her mother, father, and sisters. She confirmed that it was her testimony that Johnson was living at the house the day he was arrested.

Around 4 a.m. on May 26, a very loud noise from her mother's room woke her. When she went over there, she saw her father, mother, and S.J. She was not surprised to see her father, nor was she scared to enter the room.

8

At some point she heard a man and woman screaming, but she did not remember much about what happened after she reached the room. While in the room, she never saw her father strangle or choke her mother or hit one of her sisters. She did not remember if he made any physical contact with her mother or sisters that morning. Her father did not hit or make any physical contact with her. At some point, her mother walked, not ran, out of the bedroom, and Doe 2 returned to her room.

When she got to her room, she called 911 from her closet. She made the call because she was angry and "[t]here was just a lot going on. Chaos, I guess." She said there had been a lot of yelling, and that alone made for a chaotic environment. Because she was angry, she wanted her father out of the house that morning. While on the 911 call, she did not hear anything her father may have said. She did not remember her father ever saying that if the police came he would blow his brains out.

Doe 2 denied that she was ever fearful. She never thought her father had a gun and did not remember if she told the 911 operator he did. Later, she acknowledged it was possible her father had a gun but did not know or could not remember the basis for this belief. She had never seen her father with a gun before. She declined to describe her father as manipulative. She never saw him being physically violent with her mother.

Doe 1 testified that she had known Johnson for over two decades. They were married but separated, having broken up about a month prior to the May 26 incident. Johnson still had belongings in the Antioch house and periodically stayed there.

Two days before he came over on May 26, Doe 1 and Johnson spoke over the phone. She could not remember what they spoke about and "[could not] say for sure" whether Johnson indicated his desire to visit the house. At

9

the end of the conversation, she told Johnson that if he came over, she would call the police. She did not want to argue with him in front of their children because their relationship was not in a good state.

In the early morning hours of May 26, Doe 1 was sleeping in her upstairs bedroom. She woke when Johnson opened the door and walked in the room. She told him not to come over, but it was his place of residence. He was drunk, rambling, visibly upset, and angry but not violent or belligerent. She was angry he was there at that hour starting an argument. She did not recall Johnson ever saying to her that if she called the police, they would be dead before officers arrived. At some point, he pushed her phone towards her, and Doe 1 got out of bed to leave the room. Johnson grabbed her by the arm to keep her there. He got behind her and put his forearm on her neck. In that position with his hand close to her mouth, she bit him and was able to get away. As she was leaving, the children entered the room. Johnson and the children screamed and yelled, making for a chaotic scene. Doe 1 went downstairs to the kitchen to keep her distance from Johnson. Eventually, Johnson also came downstairs. Around that time, the police arrived, and she opened the door.

Doe 1 could not recall if Johnson ever struck or swung at her. She could not say that Johnson strangled her at any point. Nor could she say he did anything to deliberately impede her breathing, though she remembered having trouble breathing in her struggle to leave the room. She did not see Johnson strike any of their daughters.

Doe 1 added that the statement she gave the police that morning probably was not completely accurate because it was "heat of the moment." Twice, she stated she was not fearful of Johnson that night, only angry. She did not recall asking an officer for an emergency protective order. She only

10

asked for a temporary protective order so that she could put some physical space between herself and Johnson. She never saw Johnson with a gun that night either. After hearing her initial recorded interview with police on the scene, she explained that her statement regarding other instances of physical violence was not accurate. Her statement that she was scared was also not accurate. She had never been scared of physical retaliation from Johnson were she to call the police. She was just fed up with arguing with Johnson and exposing their children to that tension. In addition, Doe 1 never saw Johnson hold a gun to his head that day. Doe 1 stated she would not lie to protect Johnson, and none of her testimony reflected any effort to protect him. She and her daughters never came up with a plan for what testimony to give at trial.

S.J. testified that on the day her father was arrested, she had been awake getting ready for work when she heard her parents yelling and arguing loudly in the master bedroom. She considered her father to be living with them at the time. She walked down the hall to the master bedroom and found her parents still arguing, so she placed herself between them. Nothing physical occurred between her parents, and her mother walked out of the room. S.J. never saw her father hit her mother. He never touched her or her sisters.

After Doe 1 left, S.J. and P. went into the hallway with her father. Doe 2 was standing in one of the doorways. Her father, who was in the hallway, and her mother, who was at the top of the stairwell, continued to yell at each other. Eventually, they went downstairs. S.J. saw lights from outside and her mother went to the door. She heard her father from the guest bedroom say he was going to shoot himself. At no point, however, did she see him with

11

a gun. After her father threatened to harm himself, she heard P. tell him she loved him. Her mother let in the officers.

S.J. never saw her father holding a gun but later saw the gun when talking with the police. She never approached an officer to get his attention or told anyone there was a gun in the house. Rather, she had been approached by an officer who told her that he knew there was a gun in the house. She brought him to the downstairs bedroom and told him if there were a gun it would be there. She thought as much because her father was in that room when she heard him say he was going to hurt himself. She told the officer she did not know where in the room the gun might be. When the officer pointed to a bucket, she replied that he could check there but she would not touch anything.

## B.    Defense Case

Johnson testified on his own behalf. On May 26, he was living at the Antioch house and had been living there for about five years. He spent the night there about six nights that month, usually sleeping in the master bedroom. His belongings were there as well.

He acknowledged that Doe 1 had told him a couple of days earlier to not come by the house, but she had said similar things before and he had still been over. Besides, he had a plan to clean himself up and attend church with his daughters as a surprise. If the opportunity arose, he would also try to clear things up with Doe 1.

After Johnson let himself in the house, he walked towards his bedroom. The door was ajar, and he walked right in and saw Doe 1 awake. They exchanged greetings. He then addressed the "elephant in the room." He had been having an affair, and his mistress's husband was furious and had contacted Doe 1. The mistress's husband had told Doe 1 lies which Doe 1

12

continuously repeated to Johnson. Johnson thought these interferences were preventing his reconciliation with Doe 1. For about 20 minutes, he and Doe 1 spoke in a conversational tone. At some point, he saw her phone and pushed it to her, directing her to call his mistress's husband to clear everything up. After she refused to call, the conversation became more heated. Doe 1 called him a liar and cheater and said she did not believe anything he said. When she tried to leave, he blocked the door and told her again to call. Doe 1 again refused and told Johnson to move. He stayed put, and Doe 1 "kind of shoved [him] a couple of times" to move him and insisted that he move. He still stayed put, so Doe 1 took a swipe at his face trying to scratch him. He caught the blow with his wrists and was cut by her nails. He then grabbed Doe 1's face, and she twisted her head and bit his finger. He called her a "bitch" or "maggot bitch." He grabbed her neck and pushed her towards the bed, on which she fell. Johnson explained that he was holding Doe 1's shoulder and neck, recognizing that she might not have been able to breathe "for a second."

Their argument became very loud. When Johnson turned he saw his two oldest daughters, P. and S.J., yelling in the doorway. His other two daughters also came over. He said, "It was just so much chaos. Everybody's just yelling back and forth. Yelling, yelling, yelling, yelling, yelling." He screamed for everyone to shut up. He tried to explain what was happening but could not due to all the yelling.

Doe 1 left the room, passing her daughters standing in the doorway. Johnson pushed his way through his daughters and followed Doe 1. In the hallway, he kept yelling at Doe 1, who stood atop the stairwell. Eventually, Doe 1 went downstairs, the children scattered, and he went into the downstairs bedroom, "the only sanctuary [he] knew in the house." There, he thought about taking his life. He explained, "I was really, really, really

upset.  I was cryin' and very irate at the time.  I felt like I was having' some kind of emotional attack."  He retrieved a gun from a drawer, put the gun to the back of his head, and began to count.  Suddenly, he heard somebody screaming, "No," and telling him, "I love you,  I love you."  He felt someone pull his arm down, and his arm went limp.  All the noise of the house, which had been muffled, became loud again.  He placed the gun underneath some clothes in a basket.  He heard the door and a man in the living room call his name.  He wiped his face, got himself together, and calmly walked out to meet the officer.

Johnson did not recall or did not remember what he said to Officer Ibanez that morning.  He likely denied saying he was going to shoot himself because it was embarrassing, and he did not want anyone to know.  He also knew it was illegal for him to possess a firearm.  He did not remember telling the officer that he never got physical with anyone that morning.

Johnson stated that he never threatened Doe 1's life in the master bedroom, nor did he ever threaten his daughters.  The only life he threatened was his own.  He denied stating that he would be dead before the police came.  He denied telling Doe 1 days before his visit that if she called the police, the two of them would be dead before they arrived.  He also denied ever stating that he would blow his brains out if the police came.

Johnson acknowledged that he sent his family certain instructions, which he described as a "play" as to how to act, and that he wanted everyone to study the play and know their lines.  He sent the instructions because he wanted to "make sure that everything was . . . presented properly."  He wanted the jury – and everybody – to know that he lived in the Antioch house.  It was "kinda creepy sounding" for his family to say that he did not live in a house he had been living in forever.  He also told his family to use

14

the word "upset" and not scared because he did not want to appear to be a monster to the jury when he had no intent of harming his family. On reflection at trial, he saw that sending the instructions was a "dumb move" and regretted it, but noted he was worried about how he would come across in court.

## C.    Rebuttal

On rebuttal, Officer Ibanez testified that in his unrecorded conversation with Johnson in the living room that morning, Johnson did not say that Doe 1 hit him. Johnson indicated that he and Doe 1 had a purely verbal argument and denied that anything physical happened between them. Johnson denied having a gun or ever saying that he was going to shoot himself if the police came.

## D.    Verdict, Sentencing, and Appeal

The jury found Johnson guilty as charged on all counts. As to count 1 (first-degree residential burglary), the jury found true the allegation that Johnson was armed with a firearm during the commission of the burglary. As to count 5 (dissuading a witness by force or threat), the jury found true the allegation that Johnson personally used a firearm during the commission of the offense. On December 16, 2019, the trial court denied Johnson probation and sentenced him to state prison for three years. Johnson appealed.[2]

DISCUSSION

## A.    Count 5 – Substantial Evidence

Johnson raises as his first issue on appeal a substantial evidence challenge to his count 5 conviction for dissuading a witness under section 136.1(c)(1) based on his statement that he would blow his brains out if police

---

[2]    Upon completion of briefing in this appeal, Johnson filed a petition for writ of habeas corpus. We have disposed of the habeas petition by separate order filed today.

came to the house.  He contends there was insufficient evidence to support his count 5 conviction because he only threatened himself with this statement, and this was not evidence that he used a threat of force or violence upon "a witness or victim or any third person" within the meaning of section 136.1(c)(1).

### 1.    Applicable Law

In reviewing a claim of insufficiency of evidence to support a criminal conviction, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

"Section 136.1 criminalizes trying to dissuade a [witness] from reporting a crime.  The offense can be either a misdemeanor or felony; if the perpetrator tried to dissuade by using force or the threat of force, it is a felony." (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 415–416.)

Section 136.1, subdivision (b)(1) ("section 136.1(b)(1)"), which defines the basic crime, provides in part:  "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by a imprisonment in county jail for not more than one year or in the state prison: [¶]  (1) Making any report of that victimization to any peace officer or state or local law enforcement officer . . ." (§ 136.1, subd. (b)(1).)  Violation of this provision is a wobbler, chargeable as a misdemeanor or felony.  (*People v. Reyes* (2020) 56 Cal.App.5th 972, 982 (*Reyes*).)

16

Section 136.1(c)(1), which defines the aggravated form of the crime and subjects the perpetrator to higher penalties, provides in relevant part: "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." (§ 136.1, subd. (c)(1).)

Thus, under section 136.1(b)(1), a defendant who attempts to dissuade a victim or witness from contacting the police is guilty of either a misdemeanor or a felony, but if the defendant's attempt is accompanied by an express or implied threat of force directed at the witness, victim, or a third person, he or she is guilty of a felony with an increased term of imprisonment under section 136.1(c)(1).

### 2. Analysis

Johnson contends he cannot be guilty of felony dissuasion under section 136.1(c)(1) because under the statute's plain language, an act of attempted dissuasion must be accompanied by a threat of harm to another person: a witness, victim, or third person. Johnson asserts the charge in count 5 was solely based on his statement that if police came to the house, he would "blow his brains out." He says the only person threatened with harm by this statement was himself. Therefore, the jury's finding that Johnson's attempted dissuasion was accompanied by a threat of force or violence upon "a witness or victim or any third person" within the meaning of section 136.1(c)(1) cannot be sustained, and he cannot be guilty of a straight felony nor subject to any increased prison term under section 136.1(c)(1).

17

The People acknowledge that Johnson's conviction for count 5 was not based on any threat to shoot another person. Nor do the People dispute that his count 5 conviction was based on his act of pointing a gun to his head and threatening to blow his brains out. Rather, they argue Johnson's threat of self-harm constituted threat to a "third person" within the meaning of section 136.1(c)(1).

Thus, Johnson's substantial evidence argument raises an issue of statutory construction concerning the meaning of "third person" in section 136.1(c)(1). The parties have cited no case construing this term in the context of section 136.1(c)(1), nor have we found such any such case. Accordingly, this matter appears to raise an issue of first impression.

"In construing a statute, our role is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we must look first to the words of the statute because they are the most reliable indicator of legislative intent." (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 (*Lopez*).) " 'The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' " (*People v. King* (2006) 38 Cal.4th 617, 622.) "If the statutory language is clear and unambiguous, the plain meaning of the statute governs." (*Lopez*, *supra*, at p. 1056.)

" 'If, however, the language supports more than one reasonable construction, we may consider "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.] Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than

18

defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Lopez, supra*, 31 Cal.4th at p. 1056.) "If a statute defining a crime or punishment is susceptible of two reasonable interpretations, we ordinarily adopt the interpretation that is more favorable to the defendant." (*People v. Arias* (2008) 45 Cal.4th 169, 177.)

Here, we need not look beyond the statute's plain meaning to determine whether the Legislature intended a threat of harm to oneself to constitute a threat to a "third person" to be guilty of attempted dissuasion. Section 136.1(c)(1) unambiguously requires that a felonious act of attempted dissuasion be "accompanied by force or by an express or implied threat of force or violence[] upon a witness or victim or *any third person*." (§ 136.1, subd. (c)(1), emphasis added.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.) The Merriam-Webster Online Dictionary defines "third person" as "a set of linguistic forms (such as verb forms, pronouns, and inflectional affixes) referring to one that is neither the speaker or writer of the utterance in which they occur nor the one to whom that utterance is addressed." (Merriam-Webster Dict. Online (2022), https://www.merriam-webster.com/dictionary/third%20person [as of June 17, 2022].) The entry for "third person" in Black's Law Dictionary directs us to the definition of "third party." (Black's Law Dictionary, 11th ed. 2019, at p. 1783.) That term is defined as "[s]omeone who is not a party to a lawsuit, agreement, or other transaction but who is usu. somehow implicated in it; someone other than the principal parties." (*Id.* at p. 1782.) The entry adds, "Also termed *outside party; third person*." (*Ibid.*, emphasis added.) Both dictionary definitions

19

convey a third person to be a person besides the two primarily involved in a situation.

Applying these dictionary definitions in a reasonable and common-sense manner, we conclude that "third person" as used in section 136.1(c)(1) refers to an outside party who is neither the person making the threats or the person to whom such threats are being directed. Thus, when a person is attempting to dissuade another from contacting the police solely under the threat of self-harm, he or she is not threatening force or violence upon a third person. Accordingly, we conclude under the plain language of section 136.1(c)(1), a defendant who expressly or impliedly threatens force or violence upon himself or herself does not threaten a "third person" within the meaning of section 136.1(c)(1).

For count 5, the prosecution presented no argument or evidence that Johnson threatened anyone else beyond himself, relying solely on his statement that he would blow his brains out if the police were called to support the charge. Because there was no substantial evidence of harm to a third person, we conclude that substantial evidence did not support the count 5 conviction of attempting to dissuade a witness in violation of section 136.1(c)(1).

The People's arguments do not compel us to go beyond our plain meaning analysis or to adopt a different construction. The People do not identify any ambiguities in the statutory text, nor do they seek to present any extrinsic materials relevant to the construction of the statutory language.[3]

---

[3] We asked the parties to address at oral argument whether any extrinsic aids, including the legislative history of section 136.1, shed light on the meaning of "any third person" in section 136.1(c)(1). Although we need not go beyond the unambiguous plain meaning of the statute, we may "look to legislative history to confirm our plain-meaning construction of [the] statutory language." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046.)

Rather, the People contend in a rather conclusory fashion that "third person" is simply "anyone other than the person the defendant is trying to dissuade." In their view, Johnson was a "third person" within the meaning of the statute because he was not a victim or the witness who he was trying to dissuade. This is not persuasive. Simply because Johnson cannot be categorized as a "victim" or "witness"—as set forth in section 136.1(c)(1)—does not render him a "third person." The People provide no support for this reading of the statute which reduces "third person" into a catch-all provision

Assembly Bill No. 2909 (1979–1980 Reg. Sess.) ("AB 2909") revised California's witness intimidation statutes by (among other things) adding section 136.1 to the Penal Code—including the "any third person" phrase in subdivision (c)(1) at issue in this appeal. (See *People v. Wahidi* (2013) 222 Cal.App.4th 802, 807–809.) Analysis for AB 2909 explains that the bill was introduced to pattern the California witness intimidation statute after the model statute proposed by the American Bar Association (ABA). Section 3 of the ABA model statute, entitled "Felonious Intimidation of Witnesses and Victims," provides in part: "Every person doing any of the acts described in the misdemeanor section on intimidation of witnesses and victims in Section 2 knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony: [¶] (a) Where such act is accompanied by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or *any third person*." (Emphasis added.). It appears the language in section 136.1(c)(1) imposing higher penalties upon a defendant who uses force or the threat of force upon "a witness or victim or any third person" to dissuade one from contacting the police was taken verbatim from the model statute. Commentary on this section notes, "What may be slightly novel about this section is its inclusion of a threat directed at any third person (i.e., a spouse) in (a)." By specifying "spouse" as an example of a "third person," the commentary suggests the ABA was concerned about a perpetrator's threats of force or violence upon persons other than the perpetrator, i.e., threats of self-harm. We found nothing in the commentary to the model statute or in the legislative history materials for AB 2909 indicating that threats to oneself could qualify as threats to a "third person" within the meaning of the statute.

21

for all non-victims and non-witnesses.  Nor do the People address the ordinary and common-sense usage of "third person" discussed above.

The People further argue that had the Legislature intended for defendants to be excluded, it could have easily stated that the act of dissuasion becomes a felony when it is accompanied by a threat of force or violence upon a witness or victim or "anyone other than the defendant."  This, too, is not persuasive.  The Legislature could have chosen to explicitly include a threatened act of self-harm within the ambit of section 136.1(c)(1) by simply omitting the word "third" from the text, making dissuasion by force a felony when accompanied "by force or by an express or implied threat of force or violence[] upon a witness or victim or *any [] person*."  Instead, the Legislature chose to include "third person," and we must avoid a construction which makes that term surplusage.  (See *People v. Woodhead* (1987) 43 Cal.3d 1002, 1010 ["It is a settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided."]; *People v. Valencia* (2017) 3 Cal.5th 347, 357 [courts generally must " 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose' "].)

Finally, the People argue excluding harm to oneself from threats upon "third persons" would lead to absurd results.  They assert, "The Legislature could not possibly have intended to exclude a situation where, as here, the defendant threatened suicide in order to manipulate his family members into refraining from calling the police."  We acknowledge the force of this argument, especially on the facts of this case where the threat of self-harm could be used to exploit close family connections and a child's affection for her parent.  Nonetheless, we do not consider the result absurd in light of the

22

statute's plain meaning and purpose.  As noted by the court in *Reyes*, *supra*, 56 Cal.App.5th 972, the "purpose of section 136.1 . . . is to promote cooperation with law enforcement by criminalizing the conduct of those who seek to short-circuit investigatory efforts by dissuading victims and witnesses from reporting crime[s]." (*Id.* at p. 985.)  Our construction does not undermine this purpose, nor does it decriminalize attempted dissuasion based on threats of self-harm.  It simply removes it from the purview of being a straight felony under section 136.1(c)(1) and instead places such conduct in the domain of section 136.1(b)(1), where it may be prosecuted as a misdemeanor or a felony.  (See § 136.1(b)(1).)

If Johnson's attempts to dissuade a witness by threatening to harm himself and no one else should be considered only as a felony, it is for the Legislature to say.  We " 'may not rewrite statutes to supply omitted terms or to conform to an assumed, unexpressed legislative intent.' " (*People v. Harper* (2003) 109 Cal.App.4th 520, 524.)

Because we conclude there was insufficient evidence to support Johnson's count 5 conviction as a straight felony under section 136.1(c)(1), we reduce his conviction to dissuasion under section 136.1(b)(1), a lesser included offense.  (*See People v. Brenner* (1992) 5 Cal.App.4th 335, 341.).  On remand, pursuant to section 17, subdivision (b), Johnson may move the trial court to declare the count 5 charge, a wobbler (see *People v. Torres* (2011) 198 Cal.App.4th 1131, 1149), a misdemeanor under section 136.1(b)(1).

## B.    Count 2 – Instructional Error

Next, Johnson turns to his count 2 conviction for dissuading a witness under section 136.1(c)(1) based upon his statement to Doe 1 that if she called the police, they would both be dead before the police arrived.  Johnson contends this conviction should be reversed because the trial court

23

erroneously instructed the jury under CALCRIM No. 2623 ("CALCRIM 2623"), the pattern instruction on dissuading a witness by force or threat in violation of section 136.1(c)(1).

At the close of evidence, the trial court instructed the jury with CALCRIM 2623 as follows: "If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegations that the defendant acted maliciously and used or threatened to use force. [¶] To prove these allegations, the People must prove that: [¶] 1. The defendant acted maliciously; [¶] AND [¶] 2. The defendant used force or threatened, either directly or indirectly, to use force or violence on the person of a witness, victim, or any other person."

Johnson claims the instruction incorrectly states the law with respect to dissuading a witness under section 136.1(c)(1) because it told the jury it could convict him of count 2 if it found his act of dissuasion was accompanied by a threat of force or violence upon the person of a "witness or victim or *any other person*," rather than "any *third* person" as set forth in the statute. (Emphasis added.) In his view, this error improperly allowed the jury to convict him based solely on a threat of self-harm. It also resulted in the submission of two theories to the jury—a legally invalid self-harm theory and a legally valid harm to third person theory—and it was not possible to determine which theory formed the basis for his count 2 conviction. He further contends the error amounted to a federal due process violation.

We agree with the People's contention that Johnson forfeited this argument by not objecting to or requesting modification of CALCRIM 2623 in the trial court. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260 [defendant's failure to object to jury instruction generally forfeits appellate review]; *People v. Campbell* (2020) 51 Cal.App.5th 463, 498 (*Campbell*).)

24

While there is no dispute that Johnson did not object to CALCRIM 2623 or request any modification of the standard language in the trial court, Johnson claims there is no forfeiture because the instruction affected his substantial rights. (§ 1259; *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 916 ["[S]ection 1259 allows us to reach the merits of any claim of instructional error that potentially affects a party's substantial rights."].) A "[d]efendant's substantial rights are affected if the instruction results in a miscarriage of justice, making it reasonably probable that absent the erroneous instruction defendant would have obtained a more favorable result." (*Campbell*, *supra*, 51 Cal.App.5th at p. 499.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Here, we find that Johnson's substantial rights were not affected because it is not reasonably probable that he would have achieved a more favorable result if the trial court had not given the challenged jury instruction.

First, we have already reversed Johnson's conviction on count 5, *ante*, which was based on a statement that only threatened harm to himself (i.e, he would blow his brains out if police came to the house). Accordingly, any CALCRIM 2623 instructional error has no impact on his count 5 conviction.

Second, we harbor no reasonable doubt that the outcome on count 2 would have been better for Johnson had he secured a clarifying instruction that threats of self-harm do not violate section 136.1(c)(1). As given, CALCRIM 2623 correctly stated the law under section 136.1(c)(1) and is

25

consistent with section 136.1(c)(1)'s requirement that an act of attempted dissuasion be accompanied "by an express or implied threat of force or violence, upon a witness or victim or *any third person*." (§ 136.1, subd. (c)(1), emphasis added.) In stating the People must prove that "[t]he defendant used force or threatened, either directly or indirectly, to use force or violence on the person of a witness, victim, or any other person," the pattern instruction maintains the requirement set forth in section 136.1(c)(1) that the defendant's threat be directed at someone other than himself. Replacing "any third person" with "any other person" did not alter the meaning of the statute or the prosecution's burden.

Additionally, there is no dispute that count 2 was based on Johnson's statement to Doe 1 that they would *both* be dead if she called the police. The jury found Johnson made the statement because it convicted him on count 2, as well as the count 3 criminal threats charge which was based on the same statement. Based on this evidence, the jury could not have concluded that Johnson threatened to kill himself without also concluding he threatened to kill Doe 1 if she called the police. Thus, in light of the threat to Doe 1 encompassed by Johnson's statement that they would both be dead, his count 2 conviction could not have been based solely on a threat of self-harm.

Moreover, the prosecution's closing arguments to the jury on count 2 emphasized the threat to Doe 1 in Johnson's statement. Discussing the count 2 charge in conjunction with the count 3 criminal threats charge, the prosecutor noted Johnson's statement "willfully threatened to unlawfully kill or cause great bodily injury to (Jane Doe 1)." The prosecutor described the fear Johnson attempted to instill in Doe 1 by coming into her room that night "saying, If you call the police, you'll be dead." The prosecutor did not invoke Johnson's threat of self-harm as a basis for Doe 1's fear.

26

To the extent there was any ambiguity in the instruction under the circumstances of this case, such ambiguity did not prejudice Johnson. As the sole threatening statement at issue unequivocally included a threat to Doe 1 and the prosecutor's argument emphasized the threat to Doe 1 over any threat of self-harm, we have no reasonable doubt that a clarifying instruction, explaining that threats of self-harm do not violate section 136.1(c)(1), would not have enabled Johnson to obtain a more favorable result on count 2. Because any instructional error did not affect Johnson's substantial rights, his instructional challenge has been forfeited.

## C. Count 2 – Classification as "Violent" Felony

Johnson's abstract of judgment classifies his count 2 conviction for dissuading a witness by force or threat in violation of section 136.1(c)(1) as a violent felony. Johnson contends this is a misclassification we should modify. The People agree, as do we.

Under section 1192.7, subdivision (c)(37), a section 136.1 violation of making threats to victims or witness is classified a "serious felony." (§ 1192.7; *People v. Neely* (2004) 124 Cal.App.4th 1258, 1261, 1268 ["all felony violations of Penal Code section 136.1 are serious felonies."].)

Under section 667.5, which sets forth specific crimes which "merit special consideration" in sentencing to reflect "society's condemnation for these extraordinary crimes of violence against the person," a violation of section 136.1 becomes "a violent felony" when the offense is committed for the benefit of a criminal street gang under the section 186.22, subdivision (b)(1) gang enhancement. (§ 667.5, subd. (c)(20); *People v. Briceno* (2004) 34 Cal.4th 451, 463.) A violation of section 136.1 also becomes a violent felony if it has been charged and proved that the defendant inflicted great bodily injury on any person other than an accomplice, or if it has been charged and

27

proved that the defendant used a firearm in the commission of the offense. (§ 667.5, subd. (c)(8)).

The parties agree none of these situations are applicable to Johnson's count 2 conviction. The People further recognize that for count 2, the prosecution neither alleged nor proved that Johnson used a firearm in the commission of that crime. We agree with the parties. Thus, Johnson's conviction in count 2 should not be classified a violent felony within the meaning of section 667.5, and the abstract of judgment should be corrected to reflect this.

### D.    The Booking Fee

At sentencing, the trial court imposed a $564 "booking fee" pursuant to Government Code section 29550 et seq. Johnson asserts that the booking fee should be stricken pursuant to Assembly Bill No. 1869 (2019-2020 Reg. Sess.) ("AB 1869"), which took effect while his appeal was pending.

AB 1869, which took effect on July 1, 2021, was enacted by the Legislature "to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.) Among other things, AB 1869 repealed Government Code sections 29550.1, 29550.2, and 29550.3, which authorized trial courts to impose a criminal justice administration fee, generally known as a booking fee (*People v. Aguilar* (2015) 60 Cal.4th 862, 865). (Stats. 2020, ch. 92, §§ 24–26.) It also added Government Code section 6111, which provides: "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a

28

judgment imposing those costs shall be vacated.  [¶]  (b) This section shall become operative on July 1, 2021." (Govt. Code, § 6111.)

Under Government Code section 6111, the booking fee imposed on Johnson was no longer collectible as of July 1, 2021.  Therefore, we shall vacate the unpaid balance of the booking fee remaining as of July 1, 2021. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626–627 (*Greeley*); *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953–954; *People v. Clark* (2021) 67 Cal.App.5th 248, 259–260 (*Clark*).)

The People do not dispute that the unpaid balance of the booking fee became unenforceable and uncollectible when AB 1869 went into effect.  They argue, however, that the fee "need not be vacated because under the express terms of AB 1869," the fee "automatically became uncollectible . . . without the involvement of the courts."  This argument has been rejected by numerous courts in light of the clear statutory language declaring such fees to be "unenforceable and uncollectible" and that "any portion of a judgment imposing those costs *shall be vacated*." (Govt. Code, § 6111, subd. (a), emphasis added: see also *Greeley*, *supra*, 70 Cal.App.5th at p. 626 [observing "the statute *also* mandates that any portion of a judgment imposing those fees be vacated"]; *Clark*, *supra*, 67 Cal.App.5th at p. 260.)  Based on the plain language of the statute, the unpaid balance of the booking fee must be vacated.

## DISPOSITION

Johnson's count 5 conviction under section 136.1(c)(1) is reduced to the lesser included offense under section 136.1(b)(1), and the matter is remanded for resentencing.  On remand, pursuant to section 17, subdivision (b), Johnson may move the trial court to declare the count 5 charge a misdemeanor under section 136.1(b)(1).  In addition, the unpaid balance of

29

the booking fee, as of July 1, 2021, imposed under former Government Code section 29550 et seq. must be stricken and the portion of the judgment imposing those costs vacated. The superior court shall prepare an amended abstract of judgment and shall forward it to the Department of Corrections and Rehabilitation. The amended abstract shall also reflect that the count 2 conviction is not a violent felony.

In all other respects, the judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.


*A160025/ People v. Johnson III*

31

Trial Court:      Contra Costa County Superior Court

Trial Judge:      Hon. Christopher Bowen

Counsel:          Office of Attorney General, Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney general, Julie L. Garland, Senior Assistant Attorney General, Michael Pulos, Supervising Deputy Attorney General, Teresa Torreblanca and Lynne G. McGinnis, Deputy Attorney General, for Plaintiff and Respondent.

First District Appellate Project, Jonathan Soglin; Law Offices of Tiffany J. Gates, Tiffany J. Gates, for Defendant and Appellant.