[No. S112386. June 13, 2005.]

WASATCH PROPERTY MANAGEMENT, Plaintiff and Respondent, v. SYRIAH DEGRATE, Defendant and Appellant.

## COUNSEL

Legal Aid Society of San Diego and Bernadette E. Probus for Defendant and Appellant.

National Housing Law Project, Catherine Bishop; Legal Services of Northern California, R. Mona Tawatao, Erin Farley; Neighborhood Legal Services of Los Angeles County, David Pallack; Legal Aid Foundation of Los Angeles, Susanne Browne; California Rural Legal Assistance and Ilene J. Jacobs for Southern California Association of Non-Profit Housing, California Coalition for Rural Housing, Housing Rights, Inc., Fair Housing Foundation, Coalition for Economic Survival, Greater Long Beach Interfaith Community Organization, Long Beach Community Action Network, Long Beach Area Coalition for the Homeless, City of West Hollywood, Santa Monica Recant Control Board and Annette Osborne as Amici Curiae on behalf of Defendant and Appellant.

Brian Kelly and Donald A. Tine for City of Berkeley and City of Berkeley Rent Stabilization Board as Amici Curiae on behalf of Defendant and Appellant.

Kimball, Tirey & St. John, Patricia Helen Tirey and Gary Douglas Urie for Plaintiff and Respondent.

Heidi P. Poppe for California Apartment Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Houk & Hicks, Lloyd L. Hicks; Thomas E. Campagne & Associates and Sarah A. Wolfe for Norcal Executive Directors Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Christensen Schwerdtfeger & Spath and Sean D. Schwerdtfeger for San Diego Housing Commission as Amicus Curiae on behalf of Plaintiff and Respondent.

Peter Mezza for Housing Authority Executive Directors Association Southern California Chapter as Amicus Curiae.

## OPINION

**MORENO, J.**—The federal government, through the "Section 8" program, provides financial assistance to low-income tenants. (42 U.S.C. § 1437f.) We granted review to determine whether a landlord who terminates a tenancy agreement with a tenant receiving federal financial assistance through the Section 8 program (Section 8 tenant) is required by Civil Code section 1954.535 to give the tenant 90 days' notice if the property is not subject to a local rent control ordinance. We conclude that Civil Code section 1954.535 applies whether or not the property is subject to a local rent control ordinance, and that landlords must comply with the 90-day notice provision of section 1954.535 in order to terminate a tenancy agreement with a Section 8 tenant.

## I. FACTS AND PROCEDURAL HISTORY

Defendant Syriah Degrate, a Section 8 tenant, entered into a six-month tenancy agreement for an apartment in San Diego. The agreement began on May 1, 2000, and was to terminate on October 31, 2000, but would thereafter be renewed on a month-to-month basis. Degrate previously had entered into a one-year lease for this apartment.

On June 1, 2000, the owner of the apartment entered into a housing assistance payment contract (HAP contract) with the San Diego Housing Commission to receive funds provided to the local authority by the United States Department of Housing and Urban Development. (24 CFR § 982.451(a)(2), (b)(1) (1999).) The HAP contract provided that it "only appli[ed] to the household and unit" occupied by Degrate, and that the "contract terminates automatically if the lease is terminated by the owner or the tenant." An

owner who receives such funds also enters into a rental agreement with the Section 8 tenant (tenancy agreement), under which the tenant agrees to pay the balance of the rent due. (24 C.F.R. § 982.515 (2004).)

On January 31, 2001, plaintiff Wasatch Property Management served Degrate with a "Notice of Termination of Tenancy" that stated, in pertinent part, that "[t]he owner is electing not to renew your lease and you are being served with this NOTICE pursuant to Title 42 United States Code Section 1437f(d)(1)(B)ii." The notice directed Degrate to vacate the unit on March 2, 2001.

Degrate did not vacate the premises on March 2, 2001, as ordered by the notice of termination. On March 5, 2001, Wasatch filed an unlawful detainer complaint in San Diego County Superior Court. The superior court entered judgment in favor of Wasatch, and denied a motion by Degrate to vacate the judgment, holding that Civil Code section 1954.535[1] applies only in jurisdictions that have enacted rent control ordinances.[2]

The parties appealed the judgment to the appellate division of the superior court, which held that section 1954.535 applies only in rent-controlled jurisdictions, but reversed the trial court's judgment because Wasatch had not provided Degrate with notice of good cause to terminate the lease, as required by the lease and the HAP contract.

The appellate division of the superior court certified the case to the Court of Appeal, pursuant to California Rules of Court, rule 63. The Court of Appeal accepted certification and, in a published decision, held that: 1) the 90-day notice provision in section 1954.535 applies in all jurisdictions, including those without rent control ordinances; and 2) when a landlord terminates a tenancy agreement, thereby causing the termination of the HAP contract with the government agency, the 90-day notice provision of section 1954.535 applies. The Court of Appeal also held that the notice Degrate received was inadequate because the lessor failed to provide Degrate with notice of good cause to terminate her lease.

We granted review to clarify the proper interpretation of section 1954.535, and declined to review the Court of Appeal's alternate holding that the notice was inadequate for failure to show good cause to terminate the lease.

---

[1] All further statutory references are to the Civil Code unless otherwise specified.

[2] We use the term "rent control ordinance" to refer to an ordinance or charter provision that controls the rental rate for a dwelling or apartment unit. (See, e.g., § 1954.53.) Neither Degrate nor Wasatch contends that the rental unit at issue here, located in the city of San Diego, is governed by such a rent control ordinance.

## II. DISCUSSION

A tenant may defend against an unlawful detainer action by asserting that the lessor has not provided proper notice of termination, as required by statute. (*Kwok v. Bergren* (1982) 130 Cal.App.3d 596, 599–600 [181 Cal.Rptr. 795].) Generally, when a month-to-month tenancy is terminated without good cause, a lessor must provide the affected tenant with 30 days' notice. (§ 1946; see, e.g., *People ex rel. Dept. of Transportation v. Lucero* (1980) 114 Cal.App.3d 166, 173 [170 Cal.Rptr. 554].) However, in certain instances, section 1954.535 alters the notice requirement by requiring a lessor to provide 90 days' notice of a lease termination.

Section 1954.535 requires that: "Where an owner terminates or fails to renew a contract or recorded agreement with a governmental agency that provides for rent limitations to a qualified tenant, the tenant or tenants who were the beneficiaries of the contract or recorded agreement shall be given at least 90 days' written notice of the effective date of the termination and shall not be obligated to pay more than the tenant's portion of the rent, as calculated under the contract or recorded agreement to be terminated, for 90 days following receipt of the notice of termination of nonrenewal of the contract."

A. *Applicability of Section 1954.535 in Jurisdictions Without Rent Control Ordinances*

Wasatch contends that it was required to give Degrate only 30 days' notice of the termination of her tenancy, as prescribed by section 1946, rather than the 90-day notice required by section 1954.535, because the latter statute applies only in jurisdictions in which a public entity has enacted a residential rent control ordinance. However, nothing in the language of section 1954.535 suggests that it applies only in jurisdictions that have enacted rent control ordinances.

In ascertaining the meaning of a statute, we look to the intent of the Legislature as expressed by the actual words of the statute. (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) We examine the language first, as it is the language of the statute itself that has "successfully braved the legislative gauntlet." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298].) "It is that [statutory] language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the

Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' " (*Ibid.*)

■ Examining the language of section 1954.535, it is apparent that the statute does not apply only in jurisdictions with rent control ordinances, but rather applies anywhere in the state "[w]here an owner terminates or fails to renew a contract or recorded agreement with a governmental agency that provides" financial assistance, such as through the Section 8 program. (§ 1954.535.)

■ It appears that the Legislature deliberately decided not to limit the reach of section 1954.535 to rent-controlled jurisdictions. Not only is there no language within section 1954.535 that explicitly limits the reach of the statute to rent-controlled jurisdictions, but the same bill that added section 1954.535 to the Civil Code also amended section 1954.53 to include such an express restriction. Section 1954.53, subdivision (a)(1)(A), as amended, plainly limits its scope to a "jurisdiction that controls by ordinance or charter provision the rental rate for a dwelling or unit." Had the Legislature intended to also limit the scope of section 1954.535 in the same manner, it would have included similar language doing so. " '[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' " (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406], quoting *Ford Motor Co. v. County of Tulare* (1983) 145 Cal.App.3d 688 [193 Cal.Rptr. 511]; 2A Singer, Sutherland Statutes and Statutory Construction (6th ed. 2000) § 46:5.) Accordingly, we decline to interpret section 1954.535 to include a term limiting its application to rent-controlled jurisdictions.

Indeed, the legislative history of section 1954.535 suggests that the 90-day notice provision was meant to address issues of statewide concern. The Senate Judiciary Committee's comment on the proposed 90-day notice provision explained the purpose of the increased notice period as follows: "Proponents assert that the current requirement of 30 days notice is insufficient time for a Section 8 tenant to find replacement income and housing when the property [owner] decides to no longer accept Section 8 housing vouchers, thereby forcing the tenant to move. They assert that this proposal, requiring 90 days notice of the effective date of the landlord's termination or nonrenewal of a Section 8 agreement and freezing the tenant's rent for that period, does not impose an undue burden on the property owner. The only burden is to advise the affected tenants of the owner's decision 60 days earlier, thereby giving the affected tenants more time to prepare. This is fair,

assert the proponents, given the tight market for low-income housing and the unique relationship between the Section 8 tenant and his or her landlord." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, p. 5.)

The concern addressed by the Senate Judiciary Committee—that the typical 30-day notice provision would not afford Section 8 tenants enough time to find replacement income and housing, especially given a tight market for low-income rental housing—was not limited to rent-controlled jurisdictions. Likewise, the Assembly Committee on Appropriations understood Senate Bill No. 1098 to be a bill that sought "to address some of the issues affecting low-income renters . . . at a time when the healthy economy is pushing rent levels to new highs . . . ." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended July 8, 1999, p. 2.) This concern for low-income renters presumably extends not only to those renters in rent-controlled jurisdictions, but statewide, to all those affected by the tight housing market.

Wasatch also supports its contention that section 1954.535 applies only in jurisdictions with rent control ordinances by noting the placement of the statute within a chapter of the Civil Code under the heading "Residential Rent Control." This court, however, has noted that "[t]itle or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Although section 1954.535 was added to the Costa-Hawkins Rental Housing Act (§§ 1954.50–1954.535 (hereinafter, Costa-Hawkins Act or Act)), the short title of the chapter does not indicate that its contents are limited to rental housing within rent-controlled jurisdictions; to the contrary, the official short title of the chapter is the "Costa-Hawkins *Rental Housing* Act." (§ 1954.50, italics added.) Thus, the short title of the Civil Code chapter containing section 1954.535 indicates that the chapter's contents address rental housing in general, rather than simply residential rent control. The inclusion of the words "rent control" in the unofficial heading, which by its nature does not alter the scope, meaning, or intent of the statute, does not persuade us that the Legislature intended to limit the application of section 1954.535 solely to rent-controlled jurisdictions.

Wasatch argues, in essence, that because " '[t]he words of the statute must be construed in context' " (*Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268 [284 Cal.Rptr. 718, 814 P.2d 704]), if the Legislature had intended that the provisions of section 1954.535 apply in non-rent-controlled jurisdictions, the statute would have been placed, as other sections of Senate Bill No. 1098 (1999–2000 Reg. Sess.) were, within the appropriate non-rent-control code section. Although the Costa-Hawkins

Act was initially enacted to address issues arising in rent-controlled jurisdictions (Legis. Counsel's Dig., Assem. Bill No. 1164 (1995–1996 Reg. Sess.) 5 Stats. 1995, Summary Dig., p. 114), its terms apply to all property *in* California. (See, e.g., § 1954.52, subd. (a) ["Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit . . . ."].) Moreover, the placement of section 1954.535 within the Costa-Hawkins Act occurred several years after the initial passage of the Act. Section 1954.535 was passed as part of Senate Bill No. 1098 (1999–2000 Reg. Sess.), which contained six parts addressing a hodgepodge of unrelated issues in landlord-tenant law.[3] Absent explicit language limiting section 1954.535 to rent-controlled jurisdictions, its placement within the Costa-Hawkins Act does not persuade us that its application is so limited.

In examining the broader context of hiring rental property as addressed by title 5 of the Civil Code, it does not appear that the Legislature intended to divide the Civil Code neatly into rent-control and non-rent-control sections. The Civil Code chapter preceding the Costa-Hawkins Act contains several sections that apply to local jurisdictions that have enacted rent control ordinances. (See §§ 1947.7, 1947.8, & 1947.15.) It therefore appears that the Legislature did not intend that the Costa-Hawkins Act would contain all statutory provisions related to residential rent control. Likewise, it is not immediately apparent that we should infer the converse—especially absent persuasive evidence of legislative intent to the contrary—that all sections within the Costa-Hawkins Act are necessarily limited to residential rent control issues.

Further, it is unclear that there exists within the Civil Code a more appropriate placement for section 1954.535, whether or not it deals with rent control issues, given that it deals with a *federal* entitlement program. We certainly do not impose a requirement upon the Legislature that it create a new chapter in order to distinguish a statutory provision from its neighbors. In placing section 1954.535 within the Costa-Hawkins Act, the Legislature ensured its proximity to section 1954.53, certain subsections of which also address government-subsidized tenancies, albeit only those tenancies within a rent-controlled jurisdiction. (§ 1954.53, subd. (a)(1)(A), (B).) It thus was

---

[3] Senate Bill No. 1098 (1999–2000 Reg. Sess.) section 1 allows tenants to invite others into their homes to participate in a tenant association or to discuss tenant rights. (§ 1942.6.) Senate Bill No. 1098, section 2 amended section 1954.53, a portion of the Costa-Hawkins Act, to reduce the ability of a property owner in a rent-controlled jurisdiction to increase rents by opting out of the Section 8 program. Senate Bill No. 1098, section 3 added section 1954.535. Senate Bill No. 1098, sections 4, 5, and 6 amended the California Fair Housing and Employment Act (Gov. Code, § 12900 et seq.) to prevent discrimination on the basis of source of income. (Stats. 1999, ch. 590, § 2.)

logical to place both statutes addressing such government-subsidized tenancies in the same chapter. The placement of section 1954.535 alongside provisions applying exclusively and expressly in rent-controlled jurisdictions is therefore consistent with the proposition that the 90-day notice provision also applies in non-rent-controlled jurisdictions.

Finally, we reject Wasatch's argument that we should conclude that section 1954.535 only applies in rent-controlled jurisdictions because of the consequences that would flow from the opposite interpretation. Specifically, Wasatch fears that the 90-day notice provision, if applied statewide, would discourage landlords from participating in the Section 8 program. Presumably, though, this concern applies equally in jurisdictions with and without rent control ordinances and therefore does not bear upon the issue of whether section 1954.535 applies outside of rent-controlled jurisdictions.

■ For the above mentioned reasons, we conclude that the 90-day notice provision of section 1954.535 applies both in jurisdictions with and without rent control ordinances.

## B. *Applicability to Owner Termination of Tenancy Agreement*

Having concluded that section 1954.535 applies within jurisdictions that have not enacted rent control ordinances, we now turn to the question whether terminating a Section 8 tenancy agreement triggers the 90-day notice requirement of section 1954.535 when the terminated tenancy agreement is the subject of a related Section 8 HAP contract.

■ Section 1954.535 states that the 90-day notice provision is applicable "[w]here an owner terminates or fails to renew a contract or recorded agreement with a governmental agency . . . ." The statute clearly applies if the owner directly terminates the HAP contract with the government. However, the statute also applies where the owner knowingly *causes* the termination of the agreement with a government agency, here the HAP contract.

Federal regulations provide that the HAP contract terminates if "[t]he lease is terminated by the owner or the tenant." (24 C.F.R. § 982.309(b)(2)(i) (2004).) The terms of the HAP contract here reflect this: "[t]he HAP contract terminates *automatically* if the lease is terminated by the owner or the tenant." The converse is also true; "[i]f the HAP contract terminates for any reason, the lease terminates automatically." Ultimately, under both federal regulation and the language of the specific HAP contract at issue, terminating one contract necessarily terminates the other.

■ The principal question, then, is whether the word "terminate," as used in section 1954.535, encompasses situations in which the owner indirectly terminates the HAP contract by terminating the tenancy agreement. When

attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word. (*People v. Leal* (2004) 33 Cal.4th 999, 1009 [16 Cal.Rptr.3d 869, 94 P.3d 1071]; see, e.g., *Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1189 [90 Cal.Rptr.2d 876]; *Scott v. Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 28–30 [51 Cal.Rptr.2d 566].) The Oxford English Dictionary defines "terminate" as meaning, among other things, "[t]o bring to an end, put an end to, cause to cease; to end." (17 Oxford English Dict. (2d ed. 1989) p. 804.) This definition encompasses both directly ending something and indirectly causing it to end.

Nothing in the legislative history suggests an intent to limit the application of section 1954.535 to situations in which the owner directly terminates a HAP contract. The Senate Judiciary Committee Analysis repeatedly refers to the "owner's termination or nonrenewal of a 'Section 8' housing agreement." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, p. 3.) This language does not specify whether indirect termination of the housing agreement triggers the 90-day notice requirement, or whether only direct termination is within the scope of section 1954.535. Similarly, the Legislative Counsel's Digest, which refers to "termination of a specified rent limitation contract with a governmental agency," does not specify whether indirect, or only direct, termination of a single HAP contract would trigger the 90-day notice provision. (Legis. Counsel's Dig., Sen. Bill No. 1098 (1999–2000 Reg. Sess.).)

█ The court will apply common sense to the language at hand and interpret the statute to make it workable and reasonable. (See, e.g., *Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529, 536–537 [91 Cal.Rptr. 57, 476 P.2d 457].) Accordingly, the statute should be interpreted to avoid an absurd result. (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549]; *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, *supra*, 6 Cal.App.4th at p. 1238.)

█ Under Wasatch's proposed application of the statute, the owner of a Section 8 housing unit would be allowed, in effect, to choose between giving a 90-day or 30-day notice to a Section 8 tenant whose tenancy agreement was being terminated without cause,[4] merely based upon which contract was

---

[4] Wasatch and supporting amici curiae argue that section 1954.535 should not apply if the landlord has good cause to terminate the tenancy because the tenant had breached the terms of the rental agreement. In such circumstances, they contend, the tenant is entitled to only three days' notice of the termination of the tenancy agreement under Code of Civil Procedure section 1161, subdivisions 2 and 3. This issue is not raised by the circumstances of the present case, because the parties agree that Wasatch terminated Degrate's tenancy without cause. Accordingly, despite the fact that Degrate conceded that section 1954.535 does not apply to terminations of rental agreements for good cause, we need not—and do not—address whether the 90-day notice provision applies where the tenancy is terminated for good cause.

terminated first. As noted earlier, when an owner terminates a tenancy agreement, the HAP contract is terminated as effectively as if the owner had directly terminated it. Not only is this true under the terms of the HAP contract at issue in this case, it also is clearly required by the federal regulations governing Section 8 housing, under which the termination of the tenancy agreement *automatically* terminates the HAP contract. (24 C.F.R. § 982.309(b)(2)(i) (2004); see also Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2004) ¶ 12:50, p. 12-11 ["The HAP contract term is the same as the lease term. Both the HAP contract and housing assistance payments terminate when . . . the lease is terminated by the landlord or tenant. . . ."].)

■ Federal regulations create further interrelation and entanglement between the HAP contract and the tenancy agreement by dictating that many of the crucial terms of the tenancy agreement be included verbatim in the HAP contract. For example, federal regulations require that the HAP contract include a tenancy addendum containing certain lease provisions, including provisions that address such important topics as the minimum initial lease term. (24 C.F.R. §§ 982.308(f), 982.309(a) (2004).) Moreover, the addendum must then be added "word-for-word" to the tenancy agreement signed by the Section 8 tenant. (24 C.F.R. § 982.308(f)(2) (2004) ["All provisions in the HUD-required tenancy addendum must be added word-for-word to the owner's standard form lease that is used by the owner for unassisted tenants."].) Federal regulations also provide that the "tenant shall have the right to enforce the tenancy addendum against the owner, and the terms of the tenancy addendum shall prevail over any other provisions of the lease." (*Ibid.*) Given the extensive interrelation of the two contracts, it would make little sense to allow the owner of a Section 8 unit to attach a different notice requirement to the termination of each contract, and thereby choose which notice period applies. Nor would it be reasonable for two different notice periods to apply depending upon whether an owner happened to deliver the tenancy termination notice or the HAP termination notice first.

In sum, common sense weighs against interpreting section 1954.535 to distinguish between terminating the HAP contract and terminating the tenancy agreement. It would be absurd to apply differing notice requirements depending upon which of these two inextricably intertwined contracts the owner chose to terminate first.

## III. DISPOSITION

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

On July 27, 2005, the opinion was modified to read as printed above.