Filed 5/23/25  PS Advanced Engineering v. Skinclinical Technologies CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| PS ADVANCED ENGINEERING et al., | B328473 |
| Plaintiffs, Cross-defendants and Appellants, | (Los Angeles County Super. Ct. No. BC659295) |
| v. | |
| SKINCLINICAL TECHNOLOGIES, LLC et al., | |
| Defendants, Cross-complainants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Sotelo, Judge.  Modified and affirmed.

Wen Winny Yang, in pro. per., and for Plaintiffs, Cross-defendants and Appellants.

No appearance for Defendants, Cross-complainants and Respondents.

_____

PS Advanced Engineering (PSAE), as well as its principals, C. Don Feak III and Wen Winny Yang, appeal from a judgment in favor of respondents Skinclinical Technologies, LLC (SCT), Skinclinical LLC (Skinclinical), Thibiant Beverly Hills, LLC (Thibiant), and True North Equity, LLC (True North). Appellants became involved with respondents in a joint venture formed to promote and sell a light-based device for the treatment of facial wrinkles. The relationship quickly soured and legal proceedings commenced. Following a bench trial, the trial court entered judgment, including monetary damages, in favor of respondents.

Appellants appeal from the judgment. The bulk of their briefing fails to adequately or accurately summarize the relevant record with corresponding record citations, and relies on conclusory legal arguments without reasoned application to the facts. Appellants thus fail to demonstrate reversible error as to most of their claims. Appellants do establish material error in one aspect of the trial court's calculation of damages, however, and we accordingly modify the judgment to reflect a correct damages award.

**FACTUAL AND PROCEDURAL HISTORY**

This matter was filed in April 2017. PSAE's operative third amended complaint, filed in March 2020, alleged 10 causes of action, including fraud, misappropriation of trade secrets, and breach of contract, and named as defendants six entities, including respondents. Respondents' operative amended cross-complaint, filed in September 2019, pleaded 19 causes of action, including breach of fiduciary duty, breach of contract, and fraudulent misrepresentation. It named appellants as cross-defendants, as well as two legal entities affiliated with appellants.

The matter went to a bench trial in the spring of 2022. Evidence was presented over the course of seven days. After issuing a proposed statement of decision, to which appellants objected at a subsequent

2

hearing, the trial court issued its final statement of decision in November 2022.

**Statement of Decision**

The statement of decision sets forth the facts found by the trial court and the court's reasoning, in pertinent part, as follows: Feak has been an electrical engineer for many years. His wife, Yang, is an attorney. Feak developed a cosmetic device—referred to alternatively as the "Reverse Device," "SL-8813," and "Starlite-OM" (generally, the device or Reverse Device)— for the treatment of facial wrinkles. In 2014, he met Dr. Harry Glassman, a reconstructive surgeon involved in the skincare industry. Feak and Glassman, as well as Thibiant, a company associated with Glassman, discussed the possibility of refining the device and marketing it through a joint venture. Thibiant paid $80,000 for a study supporting the efficacy of the device, which was deemed necessary to explore selling the device on the television shopping channel QVC. After completion of the study, Thibiant transferred ownership of the study results to Skinclinical, a company associated with Thibiant.

In 2015, PSAE continued discussions regarding the possible formation of a new joint venture. As part of these discussions, Niv Carmi, another principal of Thibiant, sent e-mails to Feak and Yang discussing how PSAE would "contribute" ownership of the device to the new company. Neither Feak nor Yang disagreed with this proposition.

Eventually, Skinclinical and PSAE formed the joint venture SCT by negotiating and entering into an August 2015 Operating Agreement. Carmi became the manager and chief operating officer of SCT. Pursuant to the Operating Agreement, PSAE and Skinclinical each received an initial 50 percent interest in SCT. Skinclinical agreed to contribute $20,000 and the study to SCT, and PSAE agreed to "contribute" and assign to SCT the device. An additional term of the agreement provided that members of SCT, including PSAE, agreed to assign any rights, including intellectual property, in defined

3

"Inventions" to SCT. At trial, Feak and Yang testified that the Reverse Device was subject to this assignment requirement.

Shortly after entering into the Operating Agreement, in September 2015 PSAE was requested to sign a separate Subscription Agreement. This agreement called for PSAE to contribute ownership of the Reverse Device along with all intellectual property and related rights in exchange for PSAE's ownership interest in SCT. Yang signed the Subscription Agreement on behalf of PSAE in consultation with Feak.

Also in September 2015, SCT entered into a Consulting Agreement with Feak. The agreement called for Feak to receive $12,500 per month for three years in exchange for providing technical support for the Reverse Device and developing new devices. The agreement had a provision allowing for early termination, after written notice of default, upon the substantial failure by a party to perform under the agreement.

Around November 2015, when SCT was preparing to market, manufacture, and sell the device, it determined that it needed additional capital. Carmi and Herminio Llevat, the two representative managers of SCT designated by Skinclinical, discussed with Yang (one of two representative managers designated by PSAE, along with Feak) the capital needs. As a result of these discussions, and upon written consent of SCT's members, Thibiant was added as a member of SCT for a contribution of $150,000 in exchange for a 2.44 percent interest. PSAE's interest accordingly dropped below 50 percent. The written consent also authorized the issuance of additional membership interests for a potential contribution of up to $1.5 million. Later, in April 2016, True North was added as a member of SCT in exchange for a pledge of collateral in the amount of $1.5 million, which pledge (along with a concurrent pledge from Skinclinical) secured a loan amount of $1.5 million from a company called Gemini. In return, True North received a 20 percent interest in SCT.

4

After an evaluation process in which Feak participated, SCT engaged a company with a factory in Thailand, Qual-Pro Corporation (Qual-Pro) to manufacture the Reverse Device. SCT also retained a separate company to assist with logistics and supply chain management.

However, notwithstanding the terms of the Operating Agreement and Subscription Agreement, PSAE refused to give the intellectual property and design history files of the device to SCT, and, later, PSAE refused to sign a Bill of Sale and Assignment document formally transferring the device and associated intellectual property rights to SCT. Yang testified that PSAE never intended to "sell" the intellectual property rights. Feak testified that he defined the word "contribute," as used in the Operating Agreement, as "allowing access" or "providing access." He admitted in testimony that his definition of "contribute" was different from the dictionary definition. He did not intend to transfer ownership of the Device or the related intellectual property to SCT, regardless of the term "contribute." Skinclinical, as well as Thibiant and True North, presented evidence that they never would have agreed to the terms of the joint venture if they knew that PSAE did not intend to contribute the intellectual property for the device.

By way of a letter dated March 10, 2016, SCT demanded that PSAE immediately deliver and assign the Reverse Device and all related intellectual properly pursuant to the Operating Agreement and related agreements. PSAE, Feak, and Yang continued to refuse to contribute and assign the device and corresponding intellectual property to SCT.

Further, in early April 2016, SCT sent to Feak a notice of default on the Consulting Agreement due to " 'substantial failure . . . to perform [his] duties thereunder.' " The numerous defaults identified included Feak's " [n]on-existent, incomplete or inaccurate BOM [Bill of Materials] and product specifications to provide technical and production support, resulting in delays, incorrect orders placed to

5

suppliers, reworks and added costs and expenses,' " his " '[f]ailure to qualify batteries,' " and his " '[u]nprofessional . . . behavior, leading to . . . unwillingness of any of the team members to work with Mr. Feak and generating a non-productive and hostile work environment.' "

Meanwhile, Skinclinical secured an opportunity for SCT to sell the Reverse Device on QVC. The initial two runs on QVC in the spring of 2016 were successful, with the device selling out both times. QVC made plans to feature the item in the fall of 2016 and placed an order for more than 27,000 units, while emphasizing that it had strict delivery expectations for the product.

The opportunity with QVC was hindered by appellants' disruptive acts, however. In March 2016, Carmi was notified that Feak was attempting to disrupt the manufacturing process and delaying the production of the Reverse Device. Further, in April 2016, Feak and Yang demanded that SCT " 'disband,' " a demand that SCT refused. Feak and Yang threatened to harm SCT by contacting QVC, as well as federal agencies, with false information that would impact SCT's ability to sell the device. Moreover, because of Feak's refusal to give SCT the documentation relating to the Reverse Device's intellectual property, SCT could not obtain regulatory approval to sell the device through QVC in Europe.

Later, in July 2016, Feak traveled to Thailand and forced his way into a meeting with a company that supplied an essential plastic component of the Reverse Device to Qual-Pro, the manufacturer. Feak demanded that the company remove the mold with the plastic component from the factory premises and stop producing the component. The Reverse Device could not be manufactured without the component, and with production of the component stopped, production of the device stalled. PSAE eventually relented and allowed some production to continue, but authorized production of only 20,000 units, fewer than the 27,000 ordered by QVC. Due to the disruptions caused by Feak and Yang, including their refusal to transfer ownership of the

6

Reverse Device and intellectual property from PSAE to SCT, SCT could not meet QVC's purchase orders.

Months after this legal action commenced in April 2017, Feak started a company in Singapore, Azure Medical Technologies (Azure). Without informing SCT, Feak used Azure to develop and market a version of the Reverse Device called the "Orion," which (according to Feak's testimony) was essentially a Reverse Device with a different finish. Around the same time, Yang created a California corporation, AMT Global (AMT), that began to sell the Orion. Feak testified that Azure sold $100,000 to $130,000 of Orion devices and that AMT had net sales from the product of $65,000 to $265,000.

In light of its findings, the trial court found that PSAE failed to prove any of its claims. In essence, the court found that PSAE's lawsuit was based on the notion that respondents conspired to "steal" PSAE's "invention away from it," but that the evidence favored the opposite conclusion. Any allegations that PSAE was harmed due to defendants' conduct were belied by the refusal of PSAE, Feak, and Yang to comply with the obligations to contribute the Reverse Device and associated intellectual property to SCT.

As to the cross-complaint, the trial court found that respondents proved the majority of their causes of action. The court explained the root cause of SCT's failure as follows: "[W]hen the Joint Venture here got started and the Operating and Consulting Agreements were being negotiated by Yang for PSAE and Feak, Feak was 'going along for the ride'—because his wife Yang was pushing the idea, but . . . Feak never intended to follow through with his promise to contribute the Device to SCT." The court continued that Yang later "join[ed] in 'Feak's reckless ride,' " and, in refusing to transfer the Reverse Device and intellectual property, appellants "refused to provide the documentation SCT requested to aid in the manufacture and licensing of the Reverse Device." As a result, "Since SCT could not manufacture the Reverse Device without the [intellectual property], its sales dropped to $0."

7

Based on its findings of liability, the trial court awarded monetary damages on the cross-complaint. Skinclinical was awarded a total of $2,045,000, consisting of: $1.52 million "it loaned to SCT or had to cover when SCT defaulted on the Gemini loan"; $120,000 for monies paid to Feak under the Consulting Agreement; $10,000 for amounts paid in royalties to PSAE; and $395,000 in disgorgement for improper sales of the device by Azure and AMT. Thibiant was awarded a total of $150,000 for the amount "it invested in SCT." Additionally, True North was awarded $800,000 for "its repayment of the Gemini loan on SCT's behalf."

## Additional Proceedings

The trial court entered judgment in favor of respondents in February 2023. Appellants filed a timely notice of appeal. Following the filing of appellants' opening brief, no respondent's brief was filed, and respondents have not otherwise appeared in this appeal.

## DISCUSSION

Appellants challenge the judgment in numerous respects. The bulk of their challenges fail, largely due to substantial deficiencies in their references to the appellate record and inadequate legal argument. Appellants are successful on one point, however. The damages amount awarded in the statement of decision is based on a double-counting of a defaulted loan amount. We accordingly reduce the total amount awarded to respondent Skinclinical by $700,000.

## I. Deficient Briefing

We start by reciting some basic rules of appellate procedure. "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) An appellant's obligations on appeal include a discussion of all significant facts, not just those favorable to the appellant. (*Perry v.*

8

*Kia Motors America, Inc.* (2023) 91 Cal.App.5th 1088, 1096.) Accurate and complete citations to the record are also mandatory. (Cal. Rules of Court, rule 8.204(a)(1)(C) [any reference to a matter in the record must be supported by a citation to the place in the record where the matter appears].)

Appellants' opening brief[1] fails to meet these requirements. The brief's lengthy statement of facts contains only several citations to the record. The vast majority of matters referenced contains no citation at all. We are thus left to guess as to whether (or where) support for many of appellants' assertions appear in the record. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 ["We are not required to search the record to ascertain whether it contains support for [appellant's] contentions"].)

Moreover, much of appellants' narrative of facts is contrary to the trial court's own factual summary in the statement of decision. Appellants' primary challenges are to the trial court's findings and the evidence underlying them. To the extent the briefing focuses on only the purported facts and evidence favorable to their side, appellants "fail[] to demonstrate any error and waive[] the contention that the evidence is insufficient to support the judgment." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) "An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient." (*Ibid.*)

---

[1] No respondent's brief was filed. "[W]e do not treat the failure to file a respondent's brief as a 'default' (i.e., an admission of error) but independently examine the record and reverse only if prejudicial error is found." (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1203.)

Finally, the opening brief is also deficient in its failure to adequately address applicable legal authority.  Again, many legal assertions in the brief do not cite case law or any other legal grounds for support.  These assertions may likewise be treated as waived.  (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 1004.)

## II.  Claims Relating to Liability and Court Conduct

Despite the deficiencies of appellants' briefing, we address their arguments regarding the trial court's findings of liability and a related claim that the trial court committed misconduct.

Our review is largely dictated by the procedural history of the case.  "In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]' [Citation.]  In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]' [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment."  (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)

The issues raised by appellants are primarily subject to the substantial evidence standard of review.  "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such*

10

*substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 (*Bowers*).)

Appellants' first argument is that the trial court erred in finding that the Operating Agreement and related contractual obligations required PSAE to assign, or transfer ownership, of the Reverse Device and related intellectual property to SCT. Appellants contend that the trial court instead should have believed the testimony of Feak. Feak stated that he defined the contractual term "contribute" as merely " 'allowing access' " or " 'providing it.' "

The trial court was under no obligation to give effect to Feak's belief regarding the meaning of the word "contribute." "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) "The words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.) The trial court in this case appropriately considered the dictionary definition of "contribute" as "to give." No further analysis was required.

Moreover, even if consideration of extrinsic evidence was warranted to discern the meaning of "contribute," the evidence at trial supported a conclusion that Feak and Yang themselves effectively agreed with the trial court's definition. Discussions prior to formation of the joint venture included the point that PSAE would contribute ownership of the device to the new company, Feak and Yang both testified that the Reverse Device was subject to the Operating Agreement's assignment requirement, and the Subscription Agreement, which was signed by Yang, called for PSAE to contribute ownership of the Reverse Device along with all intellectual property

11

and related rights in exchange for PSAE's ownership interest in SCT. Appellants thus fail to demonstrate that the trial court erred in finding that PSAE was required to "give" the Reverse Device and related intellectual property to SCT by assigning it, rather than merely "allowing access" to it.[2]

Appellants next take issue with the trial court's evidentiary determination that Feak breached his Consulting Agreement. Appellants fault the trial court for relying, in part, on a "notice of default" issued to Feak detailing his asserted breaches. Appellants do not provide an adequate explanation or summary of the relevant record related to this issue, however, and therefore cannot demonstrate error. In any event, Michael Vitek (who, according to the opening brief, "testified for SCT at trial") testified regarding a number of wrongful acts committed by Feak—including that Feak refused to contribute intellectual property and created disruptions at SCT—providing substantial evidentiary support for the trial court's determination.

Appellants also argue that the trial court erred in finding that appellants' actions (rather than respondents') were the primary cause of SCT's problems. Again, among other evidence, Vitek testified as to various ways in which appellants' conduct harmed the business, including through their lack of cooperation regarding the product manufacturing. Considering this and related testimony, the trial court's finding is supported by substantial evidence, and it is immaterial whether the trial court might have reached a differing conclusion. (See *Bowers, supra,* 150 Cal.App.3d at p. 874.) Relatedly,

---

[2] Appellants' related contention that the Subscription Agreement was invalid because Yang signed it "under duress" is unavailing because, even if the trial court did not consider the Subscription Agreement, there was an adequate basis to find that the obligation to "contribute" was an obligation to "give." In any event, appellants do not show that the trial court could not properly consider the terms of the Subscription Agreement in determining PSAE's commitments.

appellants argue that the trial court should have found that respondents breached fiduciary duties owed to PSAE. As this was an issue where appellants bore the burden of proof at trial, appellants must demonstrate on appeal that the evidence in their favor was " ' " '(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " ' " (*Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 744.) Appellants' briefing is insufficient to make this showing and, in any event, the record shows that the evidence relating to claimed breach of fiduciary duties was (at a minimum) not uncontradicted.

Appellants' next contention is that the trial court committed misconduct and exhibited bias against appellants by the manner in which it characterized and weighed the evidence. It is well settled that judicial conduct becomes impermissible bias only when it is " ' "so prejudicial that it denie[s] [a party] a fair, as opposed to a perfect, trial." ' " (*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 536–537.) Dissatisfaction with a trial court's rulings does not establish judicial bias. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) At their essence, appellants' complaints about the trial court's findings are based on little more than an assertion that the court should have sided with appellants over respondents. That is an insufficient basis for a claim of judicial misconduct.

Finally, appellants argue that the statement of decision contains "derogatory and insulting remarks about Feak and Yang." When an appearance of " 'judicial bias and unfairness colors the entire record,' " reversal can be warranted. (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1008.) " 'The test is not whether plaintiff has proved harm, but whether the court's comments would cause a reasonable person to doubt the impartiality of the judge or would cause

13

us to lack confidence in the fairness of the proceedings such as would necessitate reversal.' " (*Ibid.*)

In this case, an appearance of bias and unfairness does not color the entire record. Appellants complain about portions of the statement of decision, including a description of Feak as "appear[ing] to fit the caricature of the strong-willed, mad-scientist-inventor, who is not only ALWAYS RIGHT about everything, but who's [*sic*] CREATION is so much an extension of himself, that to lose even partial control of it would to him be like 'cutting off his hand.' " The trial court also wrote that "Feak's personal characteristics simply did and do not 'allow him' to accept the commercial reality of having to 'contribute' his invention to—to share his device—with the newly created Joint Venture SCT. Feak's entire conduct after entry into the Operating Agreement and during this trial, reveals a consistent attitude: 'I don't care what I signed! To heck with what my wife wants me to do, SCT can't have my Device! Its [*sic*] mine! And it's mine ALONE!' " While this language is excessively colorful and ultimately unhelpful, the statement of decision runs 45 pages, and the court's characterizations of Feak cover only a small portion of the decision. Furthermore, although the court got carried away with its descriptions of Feak, the conclusion that Feak adamantly resisted contributing the device does find support in the record. Appellants' claim of judicial misconduct therefore fails.

## III. Damages

Although the opening brief is deficient in numerous respects, it does adequately identify one material error in the statement of decision and subsequent judgment.

The statement of decision awarded a total of $2,045,000 in damages to respondent Skinclinical. One-and-a-half million dollars of this total was awarded to Skinclinical for amounts "it loaned to SCT or

14

had to cover when SCT defaulted on the Gemini loan."[3]  Respondent True North, meanwhile, was awarded $800,000 for "its repayment of the Gemini loan on SCT's behalf."

Evidence at trial showed that two loans originated from Gemini, and that these loan amounts totaled $1.5 million.  The statement of decision likewise referenced this $1.5 million total loan amount.  There was no evidence of any additional loans.  The statement of decision, however, awards a total of $2.3 million in damages accruing from default on the Gemini loans—$1.5 million to Skinclinical and $800,000 to True North.

The statement of decision, therefore, double-counts the $800,000 that True North repaid on "the Gemini loan on SCT's behalf," in the $1.5 million that Skinclinical "loaned to SCT or had to cover when SCT defaulted on the Gemini loan."  There is no indication from the record or from the statement of decision that total loans in an amount greater than $1.5 million were made.  Moreover, the record contains no evidence that any interest (or other charges) additional to the principal amount was owed or incurred.  Because the record contains evidence of only $1.5 million in total loan amounts outstanding, the trial court's award of $2.3 million for loan-related damages is erroneous.

According to the Statement of Decision, an $800,000 payment was made by True North for "repayment of the Gemini loan on SCT's behalf."  That leaves $700,000 in total loan-related damages remaining.  The $1.5 million awarded to Skinclinical for loan-related damages must therefore be reduced to $700,000.  Accordingly, we modify the judgment to reflect a total damages award to Skinclinical of $1,345,000, with the rest of the judgment remaining the same.

---

[3] The statement of decision refers to an amount of $1.52 million, but the opening brief explains that $20,000 of this total represented Skinclinical's initial investment in SCT.

The remainder of appellants' arguments fail. Appellants complain about the statement of decision's conclusion that $395,000 be disgorged to account for Azure and AMT's sales of the device. Appellants acknowledge, however, that $395,000 in total sales was within the range of the total sales amount testified to by Feak. Any claim that this total was incorrect, or that the trial court made other errors in assessing damages, is not supported by the evidence.

## DISPOSITION

The judgment is modified by reducing total damages awarded to respondent Skinclinical, LLC by $700,000, resulting in a total award of $1,345,000 to Skinclinical, LLC. As modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.

16